DAVID E. OLSEN, SBN: 250784
LawOfficeofOlsen@gmail.com
3013 Wolsey Pl.
Fremont, CA 94555
510-371-9648
510-404-5302 (fax)

Attorney for Defendants:
 Evye Szanto, Victor Szanto
 Nicole Szanto, Kimberley Szanto,
 Mariette Szanto, Anthony Szanto,
 Austin Bell, John Barlow,
 Barbara Szanto Alexander

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF OREGON

| | |
|---|---|
| Peter Szanto<br><br>                    Debtor<br>Peter Szanto<br>                    v.<br>Evye Szanto, et al.<br><br>                    Defendants. | Case No.: 16-33185-pcm11<br><br> Adv. Proc. No. 16-03114-pcm<br><br>MOTION TO DISMISS THE COMPLAINT FOR FAILING TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6); AND DISMISSAL FOR LACKING SUBJECT MATTER JURISDICTION UNDER FED. R. CIV. P. 12(b)(1), UNDER OREGON LONG ARM STATUTE 4, AND UNDER 28 USC 1332. |

## I.  ADDITIONAL FACTS

A.     The Szanto Family Trust, to which the Plaintiff refers, became "The Paul Szanto

Survivor Trust" in 2005 upon the death of Plaintiff's parent Klara Szanto.  (*See.* Exhibit 1).

1
MOTION TO DISMISS THE COMPLAINT FOR FAILING TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6); AND DISMISSAL
FOR LACKING SUBJECT MATTER JURISDICTION UNDER FED. R. CIV. P. 12(b)(1), UNDER OREGON LONG ARM STATUTE 4,
AND UNDER 28 USC 1332.

Case 16-03114-pcm    Doc 43    Filed 11/15/16

B.   Plaintiff was specifically excluded as beneficiary of the Paul Szanto Survivor Trust:

"…'Settlor's children' shall only refer to Barbara Alexander, Victor A.
Szanto, and Anthony Szanto.  For all purposes of this trust and any trust
created pursuant to the terms of this trust, and all distributions taking place as
a result of any terms contained herein, Peter Szanto shall be deemed to have
predeceased the Settlor without leaving descendants surviving.  Settlor has no
other children, living or deceased, leaving descendants surviving."

*(See Exhibit 1-1,* 1.2 Trust Beneficiaries.)

C.   Defendants Victor and Tony Szanto are the named Trustees in the Paul Szanto Survivor Trust, have performed as Trustees and no other Defendants have acted as trustees of the Family Trust which would create a fiduciary relationship with Trust beneficiaries. (*See Exhibit* 1-20, 22.)

D.   In prior litigation, Courts have noted that Plaintiff and is not a beneficiary of his parents Trust.  (*See* Exhibit 2-8.)

E.    Plaintiff's affiliation with Defendants Austin Bell and John Barlow is that they were witnesses against Plaintiff in a suit against Victor and Evye Szanto and their LLC in an evidentiary hearing November 17, 2014 in the United States District Court - District of Nevada (*See* Exhibit 3, pg. 4, ln. 25 - pg. 5, ln. 4).  This case is under appeal and John Barlow and Austin Bell may have to testify again in these proceedings.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

## **II. ARGUMENT**

Defendants asks the Court to note that Plaintiff's litigation appears to be a continuation of a decade of litigation against the Trustees of his parents estate, his brothers, for being written out of this parents estate.  For the first time, Plaintiff has included all of his siblings, most of their spouses, and Plaintiff's nieces.  Even more disturbing is inclusion the Defendants John Barlow

MOTION TO DISMISS THE COMPLAINT FOR FAILING TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6); AND DISMISSAL
FOR LACKING SUBJECT MATTER JURISDICTION UNDER FED. R. CIV. P. 12(b)(1), UNDER OREGON LONG ARM STATUTE 4,
AND FRCP 4.38 USCS 1332

Case 16-03114-pcm   Doc 43   Filed 11/15/16

and Austin Bell who were witnesses in recent Plaintiff's litigation against Victor and Evye Szanto and their LLC, Marina I and II. The apparent motive is at best to punish them for their participation and at worst to intimidate these witnesses from future testimony.

## A. All Causes of Action Should be Dismissed for Failure to State a Claim Pursuant to Federal Rules of Civil Procedure ("FRCP") 12(b)(6).

Pursuant to Federal Rule of Civil Procedure (FRCP) 12(b)(6) a complaint may be dismissed for "failure to state a claim upon which relief can be granted."

FRCP 8(a)(2) sets the standard for a Complaint. The rule requires a "short and plain statement of the claim" showing the plaintiff is entitled to relief. The rule does not require detailed factual allegations, but does require more than an unadorned, "the defendant unlawfully harmed plaintiff" allegation (*Ashcroft v. Iqbal,* 556 U.S. 662, 677-78, 129 S.Ct. 1937, 1949 (2009)). A pleading that offers "labels and conclusions" or a "formulaic recitation of the elements of a claim will not do." (*Id.* at 1949 (quoting *Bell Alt. Corp. v. Twombly,* U.S. 544, 577, 127 S. Ct. 1955, 1966 (2007)).

On a Motion to Dismiss, the Complaint must be dismissed if it does not allege "enough facts to state a claim for relief that is plausible on its face." (*Ashcroft v. Iqbal,* 129 S.Ct. 1940). In *Twombly,* the Supreme Court sustained a motion to dismiss because the Complaint did not allege sufficient facts showing a claim was plausible rather than merely conceivable. (*Bell Alt. Corp. v. Twombly,* 550 U.S. at 570 (2007)).

As such, a two part analysis is used by courts to determine if a Plaintiff's complaint meets the necessary standard. Where a Complaint pleads "facts" that are merely consistent with a Defendant's alleged liability, it stops short of the line between possibility and plausibility of entitlement to relief. (*Ashcroft, supra,* 129 S.Ct. at 1949). Also, where the well-pleaded facts do

MOTION TO DISMISS THE COMPLAINT FOR FAILING TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6); AND DISMISSAL FOR LACKING SUBJECT MATTER JURISDICTION UNDER FED. R. CIV. P. 12(b)(1), UNDER OREGON LONG ARM STATUTE 4, AND FED. R. CIV. P. 4(k)(2) Under Fed. 21

Case 16-03114-pcm    Doc 43    Filed 11/15/16

not permit the Court to infer more than a mere *possibility of misconduct,* the Complaint may have alleged the possibility of a claim, but it has not demonstrated a *plausible* claim entitled to relief. (*Id.* at 1950).

1.     *Plaintiff's "Facts" are legal conclusions, statements consistent with Defendants' liability, a mere possibility of misconduct, and do not state neutral plausible facts.*

Plaintiff's first fact, "…rob, loot, and abscond with various Szanto Family trust assets", (*Complaint:* Dkt. No. 1, ¶10) is a merely an allegation and a legal conclusion. The use of "rob" and "loot" is an allegation based on the legal conclusion that Plaintiff has a right to the Szanto Trust assets which were violated. Further, as noted in Exhibit 1-1, Plaintiff is not a beneficiary of this Trust and has no standing to challenge trust distributions or management so this allegation is not plasible. Additionally, this fact is not related to any of the four causes of action, all of which all based on claims of identity theft.

Plaintiff's second fact, "…to make ASSETS, in which plaintiff was entitled to a share…", (*Dkt. No. 1,* ¶11) is not plausible given that Plaintiff is not a beneficiary of the Family Trust. (*See* Exhibit 1-1, 1.2 Trust Beneficiaries). Further, the California Appellate Court have noted in prior litigation that the Plaintiff is not a beneficiary of the Szanto Trust. (*See* Exhibit 2-8.)

Fact three, "…strategy employed by [Defendants] was the …use of plaintiff's identity and identifying information" (*Complaint:* Dkt. No. 1, ¶12) is merely an allegation and a statement consistent with an element of criminal identity theft. Such statement does not cross the line from possible to plausible in part because no criminal case or investigations regarding identity theft has been brought against any of the Defendants.

Fact four, "Plaintiff's identity…being readily available from various Szanto family trust

MOTION TO DISMISS THE COMPLAINT FOR FAILING TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6); AND DISMISSAL
FOR LACKING SUBJECT MATTER JURISDICTION UNDER FED. R. CIV. P. 12(b)(1), UNDER OREGON LONG ARM STATUTE 4,
AND DOE 13-8 USC 1332

Case 16-03114-pcm    Doc 13    Filed 11/15/16

papers…" (*Id. at* ¶13), is speculation and a mere allegation consistent with Plaintiff's alledged

harm. Trust paperwork typically provides only names and dates of birth, insufficient for identity

theft. John Barlow is a business acquaintance who sold vehicles to Victor. Austin Bell was only

a friend of Kimberly Szanto while living in Southern California. Only Victor and Anthony were

Trustee and Executors dealing with their parent's estate. None of the other Defendants were

involved with the Trust administration. While it is possible that the non-Trustee family

members had access to Trust information, it is not plausible. Even less plausible is that non-

family members John Barlow and Austin Bell would have access to any Szanto Trust

information.

Plaintiff's seventh fact (*Complaint,* Dkt. No. 1, ¶16), is a conclusion of the substance of

unsupplied IRS and Department of Justice information. Further, the stated fact, "…

demonstrated use of plaintiff's name and identity by the defendants to obtain credit and open

bank accounts in plaintiff's name…" are not facts at all. It is merely an allegation, hearsay, and

a statement consistent with a defendant's liability.

In conclusion, Plaintiff's facts are mere legal conclusions, allegations, lack plausibility,

and thus do not meet the pleading requirements of FRCP 12(b)(6). For at least these reasons, the

all causes of actions should be dismissed for failing to stating a claim pursuant to 12(b)(6).

*2 . The First, Second, Third, and Fourth Cause of Action are for Fraud Should Be*

*Dismissed Pursuant to FRCP 12(b)(6) for Failing to Plead Fraud with Specificity Pursuant to*

*FRCP 9(b).*

The First and Third Cause of Action are for fraud because identity theft is an act to

deceive others. The Second cause of Action is also based on identity theft and thus fraud.

"…impermissible use of plaintiff's identity and personal identifying information." (Dkt. No. 1,

MOTION TO DISMISS THE COMPLAINT FOR FAILING TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6); AND DISMISSAL
FOR LACKING SUBJECT MATTER JURISDICTION UNDER FED. R. CIV. P. 12(b)(1), UNDER OREGON LONG ARM STATUTE 4,
AND ORCP 4 S UNDER 42 USC 407(a)

Case 16-03114-pcm    Doc 43    Filed 11/15/16

¶24). The Fourth cause of action is based on identity theft as the "improper act" for conspiracy.

FRCP 9(b) states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity…." "To satisfy Rule 9(b), a plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set fourth what is false or misleading about the statement, and why it is false…." *Cooper v. Picket,* 137 F.3d 616, 625 (9th Cir. 1997) quoting *In re GlenFed, Inc. Sec. Litg.* 42 F.3d 1541, 1545, 1548 (9th Cir. 1994). Averments of fraud must be accompanied by "'the who, what, when, where, and how' of the misconduct charged." *Id.* at 616, 627. "[A] plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." *Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.),* 42 F.3d 1541, 1548 (9th Cir. 1994).

In First and Third cause of action, Plaintiff's fraud allegations do not identify what was false, or any specifics of "the who, when, where, how, and with whom" the Plaintiff's identity was use. The pleadings do not even identify the fraudulent transaction other than the Plaintiff receiving a tax bill (*See* Dkt. No. 1, Exhibit A). The only other glimmer of a fact is that the Plaintiff avers that he has "… information from the IRS and Department of Justice…" but lacks any specifics. (*See Id.* at ¶16).

Not only are the pleadings absent neutral facts regarding the fraudulent transaction, they fail to identify the transaction at all. A tax bill for debt relief (*Id. at* Exhibit A) does not by itself indicate fraud or provide any specifics regarding the fraud. Plaintiff's facts do not indicate who forgave the debt, what debt kind of debt was forgiven, when this fraud occurred, or any other information that provides specifics or any association with the Defendants.

Thus, neither the facts nor any of the Causes of Action provide the specificities of fraud

as required under FRCP 9(b). Accordingly, for at least these reasons, all causes of action should be dismissed pursuant to FRCP 12(b)(6) for failing to plea fraud with specificity.

**B.     The Causes of Action Should be Dismissed for Lacking Federal or State Subject Matter Jurisdiction.**

"Federal courts are courts of limited jurisdiction.   They possess only that power authorized by Constitution and statute…" "It is to be presumed that a cause lies outside this limited jurisdiction [internal citations omitted] and the burden of establishing the contrary rest upon the party asserting jurisdiction." (*Kokkonen v. Guardian Life Ins. Co. Of America, 511 U.S. 375, 377, 114 S.Ct. 1673, 1675, (1994)*).

Here, Plaintiff Causes of Action are based on the improper use of Plaintiff's identity (identity theft).   However, Plaintiff fails to allege any relevant law to support a civil cause of action for identity theft.  As there is no federal cause of action for identity theft for damages, and the Plaintiff has not identified a civil state law cause of action for identity theft, the claims lack any subject matter jurisdiction for the Court.

Thus, all causes of action should be dismissed pursuant to FRCP 12(b)(1) because there is not federal or state subject matter.

**C.     The Fourth Cause of Action Should be Dismissed Pursuant to FRCP 12(b)(6) for lacking an  Unlawful purpose.**

Plaintiff pleas a civil conspiracy by the Defendants to use his identity under *Pitts v. King*, 141 Or 23, 28, 15 P.2d 379(1932).  "A civil conspiracy is not an independent tort, in the absence of a statute …." *Bliss v. Southern Pacific Co.*, 212 Or. 634 at 642, 321 P.2d 324.  The damage in a civil conspiracy flows from the overt acts and not from the conspiracy.  Here, Plaintiff claims the overt action of identity theft; "…their concerted actions sought to accomplish the common

MOTION TO DISMISS THE COMPLAINT FOR FAILING TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6); AND DISMISSAL FOR LACKING SUBJECT MATTER JURISDICTION UNDER FED. R. CIV. P. 12(b)(1), UNDER OREGON LONG ARM STATUTE 4, AND 28 USC 1332(a)

Case 16-03114-pcm    Doc 43    Filed 11/15/16

unlawful purpose of use of plaintiff's identity…." (*Complaint,* Doc. No. 1, ¶35).

As argued above, Plaintiff has not plead identity theft with plausible facts or with the specificity as required under FRCP 12(b)(6) and FRCP 9(b). Plaintiff tries to bootstrap conspiracy using fact less allegations of identity thief. Thus, the Fourth Cause of Action fails for lacking a creditable overt action (unlawful purpose) to support the civil claim of conspiracy.

For at least this reason, the Fourth Cause of Action should be dismissed for failing to state a claim on which relief can be granted under FRCP 12(b)(6).

**D. The Fourth Cause of Action should be dismissed on the grounds of Forum Shopping, Because Plaintiff Tried to Bring the Same Cause of Action Against Two of the Defendants in California and Now in Oregon.**

In 2015, Plaintiff filed a complaint for identity theft against Defendants Victor and Anthony Szanto for identity theft based on the same tax assessment. United States District Court, Central District of California-Santa Ana, SACV15-00241AG. (*See Exhibit* 5). This complaint was dismiss for lacking subject matter jurisdiction under 28 U.S.C. § 1332 and 28 U.S.C. § 1331. Now plaintiff forum shops the same claims in this Court using Oregon's conspiracy law to try to create a private right of action where one does not exist under California state or federal law.

However, Plaintiff should be considered a citizen of California because he claims a "Homeowner Exemption" in 2015-2016 and 2016-2017 to the Newport Beach (note: Newport Coast and Newport Beach are the same town) California property in when this suit was filed. (*See* Exhibit 4-1, 4-2). A Homeowner Exemption can only be taken if Plaintiff's primary residence was at that residence in Newport Beach California. Thus, Plaintiff was a California citizen at the time this suit was filed. Thus, Plaintiff is now filomg in Oregon to take advantage

MOTION TO DISMISS THE COMPLAINT FOR FAILING TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6); AND DISMISSAL
FOR LACKING SUBJECT MATTER JURISDICTION UNDER FED. R. CIV. P. 12(b)(1), UNDER OREGON LONG ARM STATUTE 4,
AND UNDER FED. R. CIV. P. 8 UNDER 12(b)(1)

Case 16-03114-pcm    Doc 43    Filed 11/15/16

of Oregon's civil conspiracy law.  Additionally, Plaintiff and none of the Defendants have been citizens of Oregon.

Additional evidence of Plaintiff's California citizenship is the fact that Plaintiff only maintains a P.O. Box in Portland.  While the Plaintiff declares having an equitable interest in the property at 416 NW 13th Ave, Portland OR (*Bankruptcy* Dkt. No. *20*, Sch. A/B.), a search of the property records for all the condos at this address provides no record of ownership by Plaintiff or his wife Susan Bier (*See* Exhibit 4-3, 4-4).

For at least these reasons, the all causes of action should be dismissed on the grounds of forum shopping.

## III.   THE COURT LACKS PERSONAL JURISDICTION OVER ALL BUT TWO OF THE DEFENDANTS BECAUSE OREGON'S LONG ARM STATUE DOES NOT PROVIDE PERSONAL JURISDICTION AND THERE IS NOT FEDERAL DIVERSITY JURISDICTION UNDER 28 U.S. CODE § 1332.

The only law cited by the Plaintiff is Oregon common law conspiracy.  Thus, Plaintiff's Fourth Cause of action (*Complaint, Dkt. No.* 1*, ¶¶34, 35*) relies on Oregon law and must satisfy Oregon's long arm statue (*Or. R. Civ. P. 4*) to have personal jurisdiction.   However, only the Defendant's Victor and Evye Szanto meet the minimum contact of Oregon's long arm statute. Thus, for the remainder of the personal jurisdiction argument, to avoid having to use all but the Defendant names except Evye and Victor Szanto, the use of defendants will refer to all the defendants except for Evye and Victor Szanto.

### A.    Defendants lack minimum contacts with Oregon and thus the Court Lacks Personal Jurisdiction to Apply Oregon Law against Defendants.

Oregon's long arm statute provides personal jurisdiction over out of state citizens under

9

MOTION TO DISMISS THE COMPLAINT FOR FAILING TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6); AND DISMISSAL FOR LACKING SUBJECT MATTER JURISDICTION UNDER FED. R. CIV. P. 12(b)(1), UNDER OREGON LONG ARM STATUTE 4, AND DOCTRINE OF FORUM NON-CONVENIENS

Case 16-03114-pcm  Doc 43  Filed 11/15/16

the following situations, none of which apply to the defendants. Oregon's statutes provides personal jurisdiction when there is Local Presence or Status. *Or. R. Civ. P. 4 A.* Personal jurisdiction is found when a person is served within the state, is domicile within the state, is a corporation created under the laws or the state, engages in substantial activities within the state, or has consented to jurisdiction within the state. (*See Id.* at A.(1)-A.(5)). Here, none of the defendants were served in Oregon, are domicile in Oregon, are corporations, engage in substantial activities within Oregon, or have consented to jurisdiction within the state. Evidencing these facts is that all of the service of process were by mail to California and Nevada addresses (*See* Dkt. No. 5).

The second way that Oregon can obtain personal jurisdiction is if the action to which the Plaintiff is claiming injury occurred in Oregon. "*In any action claiming injury to person or property with this state arising out of an act or omission within this state by the defendant*" *Or. R. Civ. P. 4. C.* Here, there are not any facts or even allegations that a conspiracy or identity theft occurred in Oregon and there is no plausible rational offered why the defendants would travel to Oregon for such action.

While Defendants Victor and Evye Szanto own property in Oregon, state law subject matter jurisdiction still fails because there are no facts or allegations that the alleged conspiracy occurred in Oregon and that Plaintiff is a California citizen. So state law jurisdiction cannot be found where an alleged harmful act occurred out of state, by non-Oregon citizens to a non-Oregon Plaintiff. Thus, the Fourth cause of action should be dismissed for lacking personal jurisdiction under Oregon's long arm statute *Or. R. Civ. P. 4.* over the Defendants.

Alternatively, the Court should dismiss all the defendants except for Victor and Evye Szanto for lacking personal jurisdiction.

MOTION TO DISMISS THE COMPLAINT FOR FAILING TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6); AND DISMISSAL
FOR LACKING SUBJECT MATTER JURISDICTION UNDER FED. R. CIV. P. 12(b)(1), UNDER OREGON LONG ARM STATUTE 4,
AND UNDER 28 U.S.C. 1331

Case 16-03114-pcm   Doc 43   Filed 11/15/16

**B. Federal Diversity Jurisdiction Under 28 U.S. Code § 1332 is Lacking for any State Cause of Action Because Plaintiff and Several Defendants Live in California.**

As argued above, the Plaintiff is a California citizen. The defendants Nicole Szanto, Barbara Szanto Alexander, and John Barlow are California citizens. Thus, there is not diversity between the Plaintiff and all the Defendants for Federal subject matter jurisdiction pursuant to 28 USC § 1332.

For at least this reason, the Fourth cause of action should be dismissed for lacking subject matter jurisdiction under 28 U.S. Code § 1332.

## **CONCLUSION**

Plaintiff's pleadings lack neutral facts that are plausible. The facts are mere legal conclusions, and allegations that do not reach the level of plausible claims and thus do not state a claim under which relief can be granted pursuant to FRCP 12(b)(6). Further, all the causes involve elements of fraud (identity theft). None of the facts or causes of action provide the specificity of the fraudulent acts pursuant FRCP 9(b). For this reason, Plaintiff's causes of action fails to state a claim on which relief can be granted and thus should be dismissed pursuant to FRCP 12(b)(6).

Further, Plaintiff fails to state any Federal or State law for identity theft. Thus, subject matter jurisdiction based on identity theft fails under both state and federal laws. Therefore, the causes of action for identity theft fails. Only remaining is a claim under state law for Oregon civil conspiracy, which would require a finding of identity theft. Oregon's long arm statute fails to provide subject matter jurisdiction for all the defendants except Victor and Evye Szanto.

However, with If the Court finds that Plaintiff is a California citizen, then the conspiracy claim subject matter jurisdiction cannot be found in Oregon based on Federal diversity under 28

MOTION TO DISMISS THE COMPLAINT FOR FAILING TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6); AND DISMISSAL
FOR LACKING SUBJECT MATTER JURISDICTION UNDER FED. R. CIV. P. 12(b)(1), UNDER OREGON LONG ARM STATUTE 4,
AND 28 U.S.C. § 1332

Case 16-03114-pcm    Doc 43    Filed 11/15/16

1    USC 1332 for all the Defendants.

2

3    DATED: November 15, 2016
                                        LAW OFFICE OF OLSEN

4                                       /s/David Olsen

5
              Attorney for Defendants   David Olsen, Esq.
6                                       California State Bar 250784
7                                       3013 Wolsey Pl.
                                        Fremont, CA 94555
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO DISMISS THE COMPLAINT FOR FAILING TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6); AND DISMISSAL
FOR LACKING SUBJECT MATTER JURISDICTION UNDER FED. R. CIV. P. 12(b)(1), UNDER OREGON LONG ARM STATUTE 4,
AND RULES 4E AND 4D

Case 16-03114-pcm    Doc 23    Filed 11/15/16

**CERTIFICATE OF SERVICE**

Pursuant to Local Rule LR. 7005-1 the foregoing MOTION TO DISMISS THE COMPLAINT FOR FAILING TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6); AND DISMISSAL FOR LACKING SUBJECT MATTER JURISDICTION UNDER FED. R. CIV. P. 12(b)(1), UNDER OREGON LONG ARM STATUTE 4, AND UNDER 28 USC 1332, Exhibits, affidavit, and request for judicial notice was filed electronically and by email and United State Postal Service with First Class Postage affixed mailed on November 16, 2016 electronically mailed to Plaintiff at:

Electronic mail address:                    Szanto.pete@gmail.com

Postal Address:                              Peter Szanto
                                             P.O. Box 4614
                                             Portland, OR 7208

                                             /s/David Olsen _____

DAVID E. OLSEN, SBN: 250784
LawOfficeofOlsen@gmail.com
3013 Wolsey Pl.
Fremont, CA 94555
510-371-9648
510-404-5302 (fax)

Attorney for Defendants:
 Evye Szanto, Victor Szanto
 Nichole Szanto, Kimberley Szanto,
 Mariette Szanto, Anthony Szanto,
 Austin Bell, John Barlow,
 Barbara Szanto Alexander

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| Peter Szanto | Case No.: 16-33185-pcm11 |
|           Debtor | Adv. Proc. No. 16-03114-pcm |
| Peter Szanto | |
|          v. | |
| Evye Szanto, et al. | REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT FOR FAILING TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6); AND DISMISSAL FOR LACKING SUBJECT MATTER JURISDICTION UNDER FED. R. CIV. P. 12(b)(1), UNDER OREGON LONG ARM STATUTE 4, AND UNDER 28 USC 1332. |
|          Defendants. | |

PLEASE TAKE NOTE that, pursuant to Federal Rule of Evidence 201, and 803(6) Defendants

hereby request that the Court take judicial notice of the following documents in support of their

1

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS COMPLAINT FOR FAILING TO
STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6); AND DISMISSAL FOR LACKING SUBJECT MATTER
JURISDICTION

"Motion to Dismiss Complaint for Failing to State a Claim Under Fed. R. Civ. P. 12(b)(6); and Dismissal for Lacking Subject Mater Jurisdiction Under Fed. R. Civ. P. 12(b)(1)."

**EXHIBIT 2**:     A true and correct copy of the COURT OF APPEAL OF THE STATE OF CALIFORNIA FIRST APPELLATE DISTRICT, DIVISION TWO, Case No. A116147

**EXHIBIT 3**:     A true and correct copy of an Order from UNITED STATES DISTRICT COURT DISTRICT OF NEVADA , Case #3:11-CV-00394-RCJ-(VPC)

**EXHIBIT 4-1,2**:     A true and correct copy of Plaintiff's 2016-2017 and 2015-2016 Property tax records for Plaintiffs California residence.

**EXHIBIT 4-3, 4**:     A true and correct copy of the property tax records from Multnomah County, Oregon Property Records for all condominiums in at 416 NW 13th Ave, Portland, OR 97209.

**EXHIBIT 5**:     A true and correct copy of Plaintiff's complaint in the UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA, Case SAVC15:00241AG.


LAW OFFICE OF OLSEN

Dated: November 15, 2016          By: /s/David E. Olsen_____
                                             David E. Olsen, Esq.
                                             Attorney for Defendants


2

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS COMPLAINT FOR FAILING TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6); AND DISMISSAL FOR LACKING SUBJECT MATTER JURISDICTION

DAVID E. OLSEN, SBN: 250784
LawOfficeofOlsen@gmail.com
3013 Wolsey Pl.
Fremont, CA 94555
510-371-9648
510-404-5302 (fax)

DAVID E. OLSEN, SBN: 250784
LawOfficeofOlsen@gmail.com
3013 Wolsey Pl.
Fremont, CA 94555
510-371-9648
510-404-5302 (fax)

Attorney for Defendants:
 Evye Szanto, Victor Szanto
 Nichole Szanto, Kimberley Szanto,
 Mariette Szanto, Anthony Szanto,
 Austin Bell, John Barlow,
 Barbara Szanto Alexander

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF OREGON

| | |
|---|---|
| Peter Szanto | Case No.: 16-33185-pcm11 |
|        Debtor | Adv. Proc. No. 16-03114-pcm |
| Peter Szanto | |
|       v. | DECLARATION OF DAVID OLSEN IN |
| Evye Szanto, et al. | SUPPORT OF MOTION TO DISMISS THE |
| | COMPLAINT FOR FAILING TO STATE |
| | A CLAIM UNDER FED. R. CIV. P. |
|       Defendants. | 12(b)(6); AND DISMISSAL FOR |
| | LACKING SUBJECT MATTER |
| | JURISDICTION UNDER FED. R. CIV. P. |
| | 12(b)(1), UNDER OREGON LONG ARM |
| | STATUTE 4, AND UNDER 28 USC 1332. |

1

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS COMPLAINT FOR FAILING TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6); AND DISMISSAL FOR LACKING SUBJECT MATTER JURISDICTION

I, David E Olsen, declare as follows:

1.      I am an attorney at law licensed to practice before all courts of the State of California and I am a solo practitioner with the law firm Law Office of David Olsen, 3013 Wolsey Pl. Fremont California 94555 and for Defendants Evye Szanto, Victor Szanto, Kimberly Szanto, Mariette Szanto, Anthony Szanto, Austin Bell, John Barlow, Barbara Szanto Alexander. If called as a witness, I would competently testify to the following facts, all of which are within my own person knowledge.

2.      I make this Declaration in support of Defendants "Motion To Dismiss The Complaint For Failing to State a Claim Under Fed. R. Civ. P. 12(b)(6); and Dismissal for Lacking Subject Matter Jurisdiction Under Fed. R. Civ. P. 12(b)(1).

3.      Attached as Exhibit 1 is a true and correct copy of the Paul Szanto Survivor Trust Dated March 19, 1991 Restated December 31, 2005. The Trust's Provisions for Settlors' Children excludes Plaintiff as a beneficiary.

> "…'Settlor's children' shall only refer to Barbara Alexander, Victor A. Szanto, and Anthony Szanto. For all purposes of this trust and any trust created pursuant to the terms of this trust, and all distributions taking place as a result of any terms contained herein, Peter Szanto shall be deemed to have predeceased the Settlor without leaving descendants surviving. Settlor has no other children, living or deceased, leaving descendants surviving.

LAW OFFICE OF OLSEN

Dated: November 15, 2016          By: /s/David Olsen _____

David E. Olsen, Esq.

Attorney for Defendants

2

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS COMPLAINT FOR FAILING TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6); AND DISMISSAL FOR LACKING SUBJECT MATTER JURISDICTION

Case 16-03114-pcm    Doc 23    Filed 11/15/16

# THE PAUL SZANTO SURVIVOR'S TRUST

This instrument is made and executed between Paul Szanto ("Settlor") and Paul Szanto and Victor Szanto, ("Trustee") pursuant to the authority granted by Section 2 of the PAUL SZANTO SURVIVOR'S TRUST dated March 19, 1991 and completely amends the Trust in restated form. The trust shall continue to be known as the PAUL SZANTO SURVIVOR'S TRUST dated March 19, 1991.

## Section 1. TRUST ESTATE AND BENEFICIARIES

**1.1** Trust Estate; Additions. This instrument restates in its entirety a revocable trust. Settlor has transferred or will transfer to the Trustee certain property which shall constitute the trust estate and shall be held, administered and distributed according to this instrument and any amendments to it. Other property acceptable to the Trustee may be added to any trust established by this instrument in any manner, by any person.

**1.2** Trust Beneficiaries.

(a) The primary beneficiaries of the trusts created by this instrument are as follows:

(1) As long the Settlor is living, the Settlor;

(2) After the Settlor's death, some of the Settlor's children.

(b) The Settlor has four (4) children, whose names and dates of birth are:

| Peter Szanto | September 4, 1950 |
| Barbara Alexander | February 7, 1957 |
| Victor A. Szanto | August 11, 1958 |
| Anthony Szanto | October 19, 1960 |

Notwithstanding the above and regardless of whether or not it is further stated in this trust, "Settlor's children" shall only refer to Barbara Alexander, Victor A. Szanto, and Anthony Szanto. For all purposes of this trust and any trust created pursuant to the terms of this trust, and all distributions taking place as a result of any terms contained herein, Peter Szanto shall be deemed to have predeceased the Settlor without leaving descendants surviving. Settlor has no other children, living or deceased, leaving descendants surviving.

**1.3** Interpretation. The following provisions shall act as a guide in determining the meaning of any part of this instrument:

(a) "Residential property" refers to the real property the Settlor use as their principal residence and any real property the Settlor uses as a vacation or secondary residence.

Exhibit 1-1

Case 16-03114-pcm    Doc 23    Filed 11/15/16

(b) "Descendants" shall refer to lineal descendants in any degree of the ancestor designated.

(c) "Siblings" shall include half brothers and half sisters if the persons are lineal descendants of a parent of the person designated.

(d) No adopted person shall be deemed to be a child or more remote descendant unless the person was adopted during minority.

(e) "Education" includes elementary, secondary, college, university, postgraduate study and other specialized studies if, in the Trustee's discretion, the study is being pursued to advantage by the beneficiary.

(f) "Death taxes" refers to all estate, inheritance or other taxes, including any interest and penalties thereon, arising by reason of the death of the Settlor. The term, however, shall not include generation-skipping transfer taxes.

(g) "GST Exemption" refers to the exemption contained in Section 2631 of the Internal Revenue Code of 1986. At the date of this instrument the GST Exemption is $1,500,000.

(h) "Trust," "trusts" and "trust estate" shall be interpreted in the singular or plural as the context indicates.

(i) "Trustee" shall be interpreted to refer to the office and function of the Trustee, and may include one or more individuals or corporate Trustees.

(j) The masculine, feminine or neuter gender and the singular or plural number shall each include the others whenever the context indicates.

(k) Captions and headings are inserted in this Agreement for convenience of reference only and shall not be used to interpret or construe its provisions.

(l) Whenever descendants are to take trust property "by right of representation" or the manner of distribution to such a class is not specified, the property shall be distributed or allocated by dividing it into as many equal shares as there are living descendants of the nearest degree and deceased descendants of that same degree who have descendants then living. One such equal share shall be distributed or allocated to each living descendant of the nearest degree and one such equal share shall be divided in the same manner among the living descendants of each deceased descendant of that same degree.

## Section 2. AMENDMENTS AND REVOCATION

**2.1** _Amendments_. Any trust created by this instrument shall not be subject to amendment except as follows:

Exhibit 1-2

122705trust.Szanto

(a) The Settlor may amend any of the terms of this instrument at any time during their lifetime by a written instrument, other than a Will, signed and dated by Settlor and delivered to the Trustee during the Settlor's lifetime.

(b) Any trust created by this instrument which is amendable as provided in this Section may be amended by an attorney-in-fact under a power of attorney which grants the attorney-in-fact the power of amendment.

(c) No trust amendment shall increase the duties or responsibilities of the Trustee without the consent of the Trustee.

**2.2** Revocation. Any trust created by this instrument shall not be subject to revocation except as follows:

(a) During the lifetime of the Settlor, this trust may be revoked in whole or in part by a written instrument, signed and dated by the Settlor and delivered to the Trustee. On such revocation, the Trustee shall promptly deliver to the Settlor all of the property referred to in the written revocation.

(b) Any trust created by this instrument which is revocable as provided in this Section may be revoked in whole or in part by an attorney-in-fact under a power of attorney which grants the attorney in fact the power of revocation.

## Section 3. PROVISIONS OF THE TRUST DURING THE SETTLOR'S LIFETIME

**3.1** Introduction. During the Settlor's lifetime, the Trustee shall hold, administer and distribute the trust estate as set forth in this Section.

**3.2** Distribution of Property.

(a) Income from assets of the Settlor whose property was transferred to the trust shall be added to the principal and the Trustee shall pay to or for the benefit of the Settlor as much of the principal held in trust as the Settlor requests.

(b) If a guardian or conservator of the person or estate of the Settlor is duly appointed, or if in the judgment of the Trustee the Settlor is unable for any other reason to act on his or her own behalf, the Trustee shall pay to or for the benefit of the Settlor as much of the principal held in the trust as is necessary or desirable, in the Trustee's discretion, for living expenses, health, welfare, support, care, comfort and enjoyment.

## Section 4. PROVISIONS AFTER THE SETTLOR'S DEATH

**4.1** Introduction. The Trustee shall hold, administer and distribute the assets of the Trust as set forth in this Section.

Exhibit 1-3

**4.2** <u>Distributions After The Settlor's Death</u>.  After the Settlor's death, the Trustee shall distribute the trust estate as follows:

(a) The Trustee shall distribute all club memberships and tangible personal property of a household or personal nature not otherwise disposed of by this instrument, including, but not limited to, jewelry, clothing, books, antiques, household furniture and furnishings, silverware, china and glassware, automobiles, boats, sporting equipment, pictures, paintings and works of art, collections of tangible personal property, photographs and memorabilia, together with any insurance on such property, to the Settlor's children who survive the Settlor in substantially equal shares as they may select on the basis of valuation.  If no such children survive the Settlor, these gifts shall lapse.  If the Settlor's children cannot agree on a division of tangible personal property, the Trustee shall divide it among them on any basis that the Trustee in the Trustee's absolute discretion deems equitable, having due regard for the personal preferences of the Settlor's children.  Settlor requests but does not direct that the Trustee and their children follow any oral or written instructions concerning the distribution of personal property which the Settlor may from time to time make known to any one or more of them.

(b) The balance of the Trust shall be held in accordance with the Provisions for Settlor's Children set forth below.

## Section 5. PROVISIONS FOR SETTLOR'S CHILDREN

**5.1** <u>Introduction</u>.  Any of the trust estate to be held in accordance with the Provisions for Settlor's Children shall be held, administered and distributed for the benefit of Settlor's children and more remote descendants as set forth in this Section.  As stated earlier, for purposes of this Section, all of this Trust, and whether or not stated further, Peter Szanto shall be deemed to have predeceased the Settlor without leaving descendants surviving.

**5.2** <u>Division of Trust Into Separate Shares</u>.

(a) The Trustee shall divide the trust into as many equal shares as there are children of the Settlor then living and children of the Settlor then deceased with descendants then living.  The Trustee shall allocate one equal share to each then living child of the Settlor and one equal share to each group composed of the living descendants of a deceased child of the Settlor.

(b) Each share allocated to a group composed of the living descendants of a deceased child of the Settlor shall be held, administered and distributed in accordance with the Provisions for Settlor's Grandchildren set forth below.

(c) Each share allocated to a living child of the Settlor other than Barbara Alexander shall be distributed to the child free of trust.

(d) Each share allocated to Barbara Alexander shall be further divided into two shares: one share that is exempt for federal generation-skipping transfer tax purposes (Child's

Exhibit 1-4

Exempt Share) and a second share, consisting of the balance of the trust estate allocated to the child (Child's Non-Exempt Share). The Child's Exempt Share shall consist of the following:

(1) Assets equal in value to the amount of any GST Exemption of the Settlor that has been allocated to the Child's Exempt Share.

(2) Any share of any trust established under this instrument that has an inclusion ratio of zero as the result of an allocation of the Settlor's GST Exemption to one or more of such trusts.

(e) The Trustee shall hold, administer and distribute the Child's Exempt Share and the Child's Non-Exempt Share as separate trusts for the child's benefit in accordance with the provisions of the Trusts for Barbara Alexander set forth below.

(f) Unless the Settlor by the provisions of his or her Will directs otherwise, all death taxes that are attributable to a Child's Exempt Share shall be charged to the Child's Non-Exempt Share.

**5.3** <u>Trusts for Barbara Alexander</u>. The Trustee shall hold, administer and distribute the Child's Exempt Share and the Child's Non-Exempt Share as separate trusts for the benefit of the child as follows:

(a) The Trustee shall pay to or apply for the benefit of Barbara Alexander ("Barbara") the net income of the trusts in monthly or other convenient installments (but not less often than annually).

(b) If the Trustee considers the net income insufficient, the Trustee shall pay as much of the principal of the trusts as the Trustee considers reasonably necessary for Barbara's proper health, maintenance, support and education after taking into consideration, to the extent the Trustee considers advisable, any income or other resources of Barbara made known to the Trustee and reasonably available for these purposes. To the extent practicable, all discretionary invasions of principal for the benefit of Barbara shall be made from the Child's Non-Exempt Trust.

(c) From time to time during the term of the trusts, the Trustee shall distribute a portion of the principal of the trust to or for the benefit of such one or more of the group consisting of the Barbara's descendants, on such terms and conditions, either outright or in trust, as she may appoint by an acknowledged written instrument delivered to the Trustee specifically referring to and exercising this limited power of appointment. As to the Child's Exempt Trust, this lifetime limited power of appointment may only be exercised to the extent it does not exceed the greater of $5,000 or five (5) percent of the value of the trust in any year as of the preceding December 31st. This power shall lapse at the end of each year as to the prior year.

(d) After Barbara's death, the undistributed income and principal of the Child's Exempt Trust and the Child's Non-Exempt Trust, shall be distributed as follows:

Exhibit 1-5

Case 16-03114-pcm    Doc 23    Filed 11/15/16

Exhibit 1-6

**6.2** <u>Division of Trust Into Separate Shares.</u>

(a) The Trustee shall divide the trust estate into as many equal shares as there are grandchildren then living and grandchildren then deceased, leaving descendants then living. The Trustee shall allocate one equal share to each living grandchild and one equal share to each group composed of the living descendants of a deceased grandchild.

(b) Each share allocated to a group composed of the living descendants of a deceased grandchild shall be distributed to those descendants by right of representation.

(c) Each share allocated to a living grandchild shall be held, administered and distributed as a separate trust for the benefit of the grandchild in accordance with the provisions of the Trusts for Settlor's Grandchildren set forth below.

**6.3** <u>Trusts for Settlor's Grandchildren.</u> Any share of the trust estate to be held in accordance with the provisions of this Section shall be held, administered and distributed as a separate trust for the benefit of the grandchild as follows:

(a) Until the grandchild attains age twenty-one (21), the Trustee shall add income to principal and shall pay to or apply for the benefit of the grandchild as much of the principal of the trust as the Trustee considers reasonably necessary for the Beneficiary's health, maintenance, support, and education after taking into consideration, to the extent the Trustee considers advisable, any income or other resources of the Beneficiary made known to the Trustee and reasonably available for these purposes.

(b) After the grandchild attains age twenty-one (21), or when the trust is divided into shares if the grandchild has attained age twenty-one (21) at that time, the Trustee shall pay to or apply for the benefit of the grandchild the net income of the trust in monthly or other convenient installments (but not less often than annually). If the Trustee considers the net income insufficient, the Trustee shall pay to or apply for the benefit of the grandchild as much of the principal of the trust as the Trustee considers reasonably necessary for the grandchild's proper health, maintenance, support and education after taking into consideration, to the extent the Trustee considers advisable, any income or other resources of the Beneficiary made known to the Trustee and reasonably available for these purposes.

(c) When the grandchild attains age twenty-five (25), the Trustee shall distribute the entire trust estate to the grandchild. If the grandchild has attained age twenty-five (25) when the trust is divided into shares, the Trustee shall distribute all of the trust to the grandchild.

(d) If the grandchild dies before becoming entitled to receive distribution of the entire trust, the Trustee shall distribute the balance of the grandchild's trust to or for the benefit of such one or more persons and entities, including the grandchild's own estate, on such terms and conditions, either outright or in trust, as the grandchild may appoint by an acknowledged written instrument specifically referring to and exercising this general testamentary power of appointment.

Exhibit 1-7

Case 16-03114-pcm    Doc 23    Filed 11/15/16

(e) Any balance of the grandchild's trust not effectively appointed by the grandchild shall be distributed as follows:

(1) If the grandchild leaves descendants who are then living, to the grandchild's then-living descendants by right of representation.

(2) If the grandchild leaves no descendants who are then living, to the then-living siblings of the grandchild in equal shares; provided, however, that if a sibling of the grandchild is then deceased but has left descendants then living, the Trustee shall distribute the share that deceased sibling would have taken, if living, to that sibling's then-living descendants by right of representation.

(3) If there are no living siblings of the grandchild or descendants of deceased siblings, then to the then living descendants of the Settlor by right of representation.

## Section 7. PROVISIONS IF INSTRUMENT IS SILENT

**7.1** <u>Introduction</u>. If, at the time of the death of the Settlor or at any later time before full distribution of any trust established under this instrument, all of the Settlor's descendants are deceased and no other disposition of the property is directed by this instrument, the trust estate or the portion of it then remaining shall thereupon be distributed to those persons who would be the heirs of the Settlor. The identities and respective shares of such heirs shall be ascertained as though the death of the Settlor had then occurred and according to the laws of the State of California in effect at the date of execution of this instrument relating to the succession of separate property not acquired from a parent, grandparent or previously deceased spouse.

## Section 8. PAYMENT OF DEATH TAXES

**8.1** <u>Death Taxes Generally</u>. Unless specifically provided by this trust instrument or the Will of the Settlor to the contrary, all death taxes attributable to any trust property, to the Settlor's probate estate, or to any other property or transfer of property, shall be charged and collected in accordance with the provisions of California Probate Code sections 20100-20125.

## Section 9. TRUSTEE MANAGEMENT POWERS

**9.1** <u>Introduction</u>. For all trusts under this instrument, the Trustee shall have the management powers set forth below in addition to those powers now or hereafter conferred by law.

**9.2** <u>Guidelines</u>. When investing, reinvesting, purchasing, acquiring, exchanging, selling and managing property, the Trustee shall act with the care, skill, prudence, and diligence under the circumstances then prevailing, specifically including, but not by way of limitation, the general economic conditions and the anticipated needs of the trust and its beneficiaries, that a prudent person acting in a like capacity and familiar with such matters would use in the conduct

Exhibit 1-8

of an enterprise of a like character and with like aims to attain the goals of the Settlor. Investments need not be diversified.

**9.3** Investments - General. Within the limitations of the foregoing guidelines and considering individual investments as part of an overall investment strategy, the Trustee is authorized to acquire every kind of property, real, personal or mixed, and every kind of investment, specifically including, but not by way of limitation, corporate obligations of every kind, stocks, preferred or common, commodities of every nature, shares in investment trusts, investment companies, mutual funds, mortgage participations and limited partnerships.

**9.4** Retain or Abandon Property. The Trustee shall have the power to retain any property, including shares of the Trustee's own stock, or to abandon any property that the Trustee receives or acquires.

**9.5** Unproductive Property. Except when specifically restricted, the Trustee shall have the power to retain, lease, purchase, or otherwise acquire unproductive property.

**9.6** Sell, Exchange, Repair. The Trustee shall have the power to manage, control, grant options on, sell (for cash or on deferred payments with or without security), convey, exchange, partition, divide, improve, and repair trust property.

**9.7** Lease. The Trustee shall have the power to lease trust property for terms within or beyond the terms of the trust and for any purpose, including exploration for and removal of gas, oil, and other minerals, and to enter into community oil leases, pooling, and utilization agreements.

**9.8** Securities. The Trustee shall have all the rights, powers, and privileges of an owner of the securities held in trust, including, but not by way of limitation, the power to vote, give proxies, and pay assessments; to buy, sell, and trade in securities of any nature including but not limited to short sales; to participate in voting trusts and pooling agreements (whether or not extending beyond the term of the trust); to enter into shareholder's agreements; to consent to foreclosure, reorganizations, consolidations, merger liquidations, sales, and leases, and incident to any such action, to deposit securities with and transfer title to any protective or other committee on such terms as the Trustee may deem advisable; and to exercise or sell stock subscription or conversion rights.

**9.9** Investment Funds. The Trustee shall have the power to invest in mortgage participations, in shares of investment trusts and regulated investment companies, including any under the control of any investment counsel employed by the Trustee, in mutual funds, and index funds.

**9.10** Nominee's Name. The Trustee shall have the power to hold securities or other property in the Trustee's name as Trustee under this trust, or in the Trustee's own name, or in the name of a nominee, or the Trustee may hold securities unregistered in such condition that ownership will pass by delivery.

Exhibit 1-9

Case 16-03114-pcm    Doc 23    Filed 11/15/16

**9.11**   Insurance.  The Trustee shall have the power to carry, at the expense of the trust, insurance of such kinds and in such amounts as the Trustee deems advisable to protect the trust estate against any damage or loss and to protect the Trustee against liability with respect to third parties.

**9.12**   Loan.  The Trustee shall have the power to loan money to any person, including a trust beneficiary or the estate of a trust beneficiary, at interest rates and with or without security as the Trustee deems advisable.

**9.13**   Bonds - Limitations.  The Trustee shall have the power to purchase bonds either at a premium or at a discount.  For bonds purchased at premiums, the Trustee shall, in a reasonable manner, periodically repay to principal each premium from interest on the bond or sale or redemption proceeds.  For bonds purchased at discounts, the Trustee shall periodically accumulate each discount as interest and, to the extent necessary, pay such discount out of principal or from the sale or redemption proceeds.

**9.14**   Invest in Life Insurance.  The Trustee shall have the power to acquire and maintain life insurance policies on the life of any person, including a trust beneficiary, and to exercise all rights of ownership granted to such policies.

**9.15**   Trade Options.  The Trustee shall have the power to buy and sell option contracts (including but not limited to naked options, puts, calls and straddles) that give the Trustee or another the option to buy or sell, at a future time, any stock or security of any company, after reviewing the risks of such transactions compared to the possibility of preserving the capital and income values of the trust.

**9.16**   Partnership Interest.   The Trustee may enter into any general or limited partnership agreement, become and remain a partner under it, transfer to the partnership any assets of the trust estate, either real or personal, in exchange for an interest in the partnership, and carry out all the terms and conditions of any partnership agreement even though the Trustee may also be a partner of the partnership for the Trustee's own account.  The Trustee shall have the power to act as a general partner and, in the Trustee's discretion, shall be authorized to elect to act only as a limited partner of any general partnership in the trust and shall take any action necessary to effect this election.

**9.17**   Membership Interest.  The Trustee may enter into any limited liability company agreement, become and remain a member under it, transfer to the limited liability company any assets of the trust estate, either real or personal, in exchange for an interest in the limited liability company, and carry out all the terms and conditions of any limited liability company agreement even though the Trustee may also be a member of the limited liability company for the Trustee's own account.  The Trustee shall have the power to act as a manager and, in the Trustee's discretion, shall be authorized to elect to act only as a member of any limited liability company in the trust and shall take any action necessary to effect this election.

**9.18**   Closely Held Business Interest.  The Trustee shall have the power to continue to hold and operate, to sell, or to liquidate, at the risk of the trust estate, any closely held business

interest, whether proprietorship, partnership, limited liability company, corporation, or other entity. The Trustee is authorized to change the form of the business (for example, by liquidating a corporation or incorporating a proprietorship), to comply with the terms of, and to vote the stock of any business held in corporate form in accordance with, any shareholders' agreement then in effect, and otherwise to vote the stock and manage the business as the Trustee, in the Trustee's sole discretion, deems to be in the best interests of the trust. Without limiting the Trustee's discretion and without imposing any requirement on the Trustee, the Trustee is expressly relieved of any liability if the Trustee in the management of the business follows suggestions which Settlor may set forth from time to time in a "Management Letter" delivered to the Trustee. Further, the Trustee shall incur no liability for misconduct, mismanagement or negligence on the part of any employee, partner, officer or director. In the absence of actual notice to the contrary, the Trustee may accept as correct and rely on financial or other statements rendered by an accountant for the business. The business shall be regarded as an entity separate from the trust, and no accounting as to the business shall be required to be made.

**9.19** <u>Provisions Relating to Residential Property</u>.

(a) If any interest in residential property becomes subject to any trust under this instrument, the Trustee shall permit the Settlor to occupy such property without obligation to pay rent. Further, the Trustee may permit any other income beneficiary of any trust under this instrument to occupy such property, whether rent free or in consideration of payment of taxes, insurance, maintenance and ordinary repairs or such other payment as the Trustee considers reasonable and appropriate.

(b) The Trustee shall pay real property taxes, insurance premiums, expenses of maintenance and repair from the net income of the respective trusts based on their proportional interests in the property (or, if net income is insufficient, from the principal of such trusts) if the Trustee in the Trustee's discretion determines no other funds are reasonably available to the Settlor for these purposes.

(c) The Trustee shall sell such residential property only with the consent of the Settlor; provided, however, that if the Settlor is incapacitated, the consent shall not be required. If residential property is sold, the Trustee is authorized to purchase substitute residential property for the benefit of the Settlor if the Trustee deems such purchase to be necessary or appropriate considering the circumstances then existing.

**9.20** <u>Borrow - General</u>. The Trustee shall have the power to borrow money and to encumber or hypothecate trust property by mortgage, deed of trust, pledge, or otherwise, to secure the indebtedness of the trust or the joint indebtedness of the trust and a co-owner of trust property.

**9.21** <u>Borrow - Margin Accounts</u>. The Trustee shall have the power to borrow money by establishing and maintaining margin accounts with securities dealers or brokers.

**9.22** <u>Unimproved Real Property</u>. The Trustee may invest in unimproved real property and may improve such assets by expending trust principal.

Exhibit 1-11

**9.23** _Improved Real Property_. The Trustee may repair, alter, improve, remodel, construct, build, and reconstruct any and all buildings and improvements. Also, the trustee may raze existing buildings and erect new buildings, either alone or jointly with others.

**9.24** _Subdivision of Real Property_. The Trustee may (1) subdivide and resubdivide any real property of this trust; (2) sign any applications, maps, and other documents necessary to implement subdivision or resubdivision; (3) grant and dedicate, without receipt of consideration, any part of the trust property for streets, alleys, parkways, parks, or other public purposes; (4) impose on such property easements, rights of way, conditions, covenants, restrictions, and other servitudes as the Trustee, in the Trustee's discretion, may determine to be proper; (5) encumber the property to secure funds for its improvement; and (6) do all other acts necessary or proper to effect subdivision or resubdivision of property.

**9.25** _Subordination_. The Trustee may subordinate any encumbrance on property that the trust may hold if, in the Trustee's discretion, subordination does not unreasonably impair the security held for the loan or obligation.

**9.26** _Exoneration_. Certain risks are inherent in the operation of any business, and the Trustee may make decisions of a "businessman's risk" nature in contrast to the "prudent man" rule. Therefore, the Trustee shall not be held liable for any loss resulting from the retention and operation of any business unless such loss results directly from bad faith or willful misconduct. In determining any question of liability for losses, it should be considered that the Trustee is engaging in a speculative enterprise not of its own selection.

**9.27** _Indemnification_. If any business held as a trust asset and operated by the Trustee is unincorporated, all liabilities arising from it shall be satisfied first from the business itself and second out of the trust estate, and in no event shall any such liability be enforced against the Trustee personally. If the Trustee is held personally liable, it will be entitled to indemnity first from the business and second from the trust estate. Accordingly, the Trustee may acquire any additional liability policy, as a business expense, to insure and protect the business and itself.

**9.28** _Employment of Agents - General_. The Trustee may employ custodians, attorneys-at-law, attorneys-in-fact, accountants, investment advisers, corporate fiduciaries, or any other agents or advisers to assist the trustee in the administration of this trust and for management of any trust asset, and the Trustee may rely on the advice given by these agents. The Trustee shall pay reasonable compensation for all services performed by these agents from the trust estate out of either income or principal as the Trustee in the Trustee's reasonable discretion shall determine. These payments shall not decrease the Trustee's compensation.

**9.29** _Trustee Powers Survive_. All of the Trustee's powers, duties, and immunities shall continue after termination of any trust until the Trustee has made actual distribution of the trust estate.

**9.30** _Life Insurance Premiums_. The Trustee need not pay premiums, assessments, or other charges on any life insurance policy of which the trust is owner or beneficiary that are

Exhibit 1-12

required to keep it a binding insurance contract, nor shall the Trustee be responsible for determining whether the payments have been made.

**9.31** <u>Collecting Insurance Proceeds</u>. On receiving proof of death of the insured, the Trustee shall use reasonable efforts to collect all sums payable to which the trust is entitled under the policy terms. All sums received shall become principal of the trust estate, except for interest paid by the insurer, which shall become income. The Trustee shall not be obligated to take any action for collection unless and until the Trustee has been indemnified against any loss, liability, or expense, including attorney's fees.

**9.32** <u>Compromise of Claim</u>. The Trustee shall have full power to compromise, arbitrate, or otherwise adjust any claim, dispute, or controversy arising under any policy, and shall have the authority to initiate, defend, settle, and compromise any legal proceeding necessary in the Trustee's opinion to collect the proceeds of any policy.

**9.33** <u>Trustee's Receipt</u>. The Trustee's receipt to any insurer shall be considered in full discharge of the insurer's liability under the policy, and the insurer shall not be under any duty to inquire concerning the Trustee's application of policy proceeds.

**Section 10.    TRUSTEE ACCOUNTING POWERS**

**10.1** <u>Introduction</u>. For all trusts under this instrument, the Trustee shall have the following powers and duties for accounting and tax matters.

**10.2** <u>Accounting</u>. The Trustee shall periodically (but not less often than annually) render an account of its administration of any trust established under this instrument. The written approval of the accounting by any person who receives a copy of such accounting shall be a complete protection of the Trustee as to all matters and transactions stated or shown by the accounting. A parent of a minor who receives an accounting is authorized to approve any such accounting on behalf of the minor. Failure of such person to transmit to the Trustee either (a) the written approval of such accounting or (b) a written objection to the accounting, with reasons specified, within a period of thirty (30) days after receipt of the accounting shall constitute a written approval.

**10.3** <u>Principal and Income - Act Governs</u>. The Trustee shall determine all matters with respect to what is principal and income of the trust estate and the apportionment and allocation of receipts and expenses between these accounts by the provisions of the California Uniform Principal and Income Act from time to time existing. When this instrument or such Act does not provide, the Trustee, in the Trustee's reasonable discretion, shall determine the characterization.

**10.4** <u>Principal and Income - Requirements</u>. Notwithstanding the foregoing, the following requirements shall be observed by the Trustee of any trust created under this instrument in which the Settlor, the Trustee or the Trustee's Spouse or descendant is a beneficiary:

Exhibit 1-13

(a) A reasonable reserve for depreciation of all income- producing, depreciable real and personal property shall be charged to income;

(b) Capital improvements and extraordinary repairs on income-producing property shall be charged to principal, and ordinary repairs shall be charged to income;

(c) A reasonable reserve for depletion of all natural resources, including, but not limited to, oil, gas, mineral and timber property, shall be charged to income;

(d) Distribution by mutual funds and similar entities of gains from the sale or other disposition of property shall be credited to principal; and

(e) A reasonable reserve for amortization of all intangible properties having a limited economic life, including, but not limited to, patents and copyrights, shall be charged to income.

**10.5** <u>Retained Income</u>. When the Trustee retains distributable income, the Trustee shall account for the retained income as a book account loan from the beneficiary to the trust, payable on demand, and not as a trust principal asset. For income tax purposes, the Trustee shall conform its records and tax returns to the imputed interest rate requirements of the applicable tax codes.

**10.6** <u>Undistributed Income</u>. Except when this instrument provides otherwise, at the time of any trust termination the Trustee shall distribute income accrued or held undistributed to the next succeeding beneficiaries in proportion to their interests.

**10.7** <u>Expense Allocation - Proration</u>. The Trustee shall prorate all taxes and current expenses among successive beneficiaries over the period to which they relate on a daily basis.

**10.8** <u>Tax Consequences - Adjustment</u>. The Trustee shall have the power in the Trustee's reasonable discretion to do any or all of the following: to take any action and to make any election to minimize the tax liabilities of any trust and its beneficiaries. In order to compensate for the consequences of any tax election or any investment or administrative decision that the Trustee believes has had the effect of directly or indirectly preferring one beneficiary or group of beneficiaries over others, the Trustee in its reasonable discretion may allocate the benefits among the various beneficiaries and make adjustments in the rights of any beneficiaries or between the income and principal accounts.

**10.9** <u>Multiple Trusts - No Physical Division</u>. If more than one trust is held under this instrument, the Trustee shall not be required to physically segregate or divide assets between the various trusts, except on the termination of any of the trusts. However, the Trustee shall keep separate accounts for the separate undivided interests, and the trust may hold undivided interests in the same assets.

**10.10** <u>Physical Division of Trust - Generation Skipping Trusts</u>. If any trust may be subject to the federal generation-skipping tax, the Trustee may divide such trust into two separate

Exhibit 1-14

trusts of equal or unequal value, but on the same terms and with the same beneficiaries, so that the transferor's exemption under Internal Revenue Code Section 2631 may be allocated to one such trust to the exclusion of the other or disproportionately between them. It is the Settlor's intent that such division create two separate trusts so that one such separate trust has an applicable fraction of zero and the other an applicable fraction of one; and after such division the Trustee shall make any distributions of principal and any discretionary distributions of income otherwise provided for under the terms of such trust first from the separate trust that has an applicable fraction of zero.

**10.11** <u>Distributions - No Consideration of Basis</u>. In making non-prorata distributions to beneficiaries, the Trustee need not consider the income tax basis of the various assets nor make any attempt to equalize the aggregate income tax basis of assets distributed or allocated. The decision of the Trustee to consider or not to consider the income tax basis shall bind all parties in interest.

**10.12** <u>Distributions and Powers of Appointment</u>. If, on expiration of six (6) months after the death of any person holding a power of appointment created by this instrument, the Trustee has not received any document purporting to exercise the power, then the Trustee may distribute any property according to the terms of this instrument as if the power had not been exercised. If a document purporting to exercise the power shall be subsequently located, the Trustee shall not be liable to the appointees under that exercise, and the rights of the appointees and the persons receiving property from the Trustee shall follow applicable law.

**10.13** <u>Distribution - Broad Powers</u>. When the Trustee must divide any trust property into parts or shares for the purpose of distribution or otherwise, the Trustee may, in the Trustee's reasonable discretion, make the division and distribution in identical interests, in kind, or partly in kind and partly in money, prorata or non-prorata. Also, the Trustee may make such sales of the trust property as the Trustee deems necessary to accommodate such distributions.

**Section 11.    TRUST ADMINISTRATION PROVISIONS**

**11.1** <u>Introduction</u>. For all trusts under this instrument, the following provisions shall apply.

**11.2** <u>Nonassignment</u>. No beneficiary shall anticipate, assign, or encumber, or subject to any creditor's claim or to legal process any interest in principal or income before its actual receipt by any beneficiary. The beneficial interest in this trust and the principal and income rights shall be free from interference or control by any creditor of a beneficiary and shall not be subject to the claims of any such creditor and shall not be liable to attachment, execution, bankruptcy, or other process of law.

**11.3** <u>Perpetuities Savings Clause</u>. All trusts created by this instrument or by the exercise of any power of appointment shall terminate twenty-one (21) years after the last death of the Settlor's heirs living at the death of the person deemed to be the Grantor of such trust. The Trustee shall distribute the principal and undistributed income of a terminated trust to the then-income beneficiaries of that trust in the same proportion that the beneficiaries are entitled to

Exhibit 1-15

Case 16-03114-pcm    Doc 23    Filed 11/15/16

receive income when the trust terminates. If at the time of such termination the trust does not fix the rights to income, then the Trustee shall distribute the trust by right of representation to the persons who in the Trustee's reasonable judgment are entitled to receive trust payments.

**11.4** _Facility of Payment_. If income or principal is payable to a minor, to a person under legal disability, or to a person not adjudicated incompetent but who, by reason of illness or mental or physical disability, is in the opinion of the Trustee unable to manage the distribution properly, then the Trustee may, in its reasonable discretion, pay such income or principal in any of the following ways: (1) to the beneficiary directly, (2) to the legally appointed guardian or conservator of the beneficiary, (3) to a custodian for the beneficiary under the California Uniform Transfers to Minors Act, or any similar statute of another jurisdiction (4) for the benefit of the beneficiary, or (5) to an adult relative or friend in reimbursement for amounts properly advanced for the benefit of the beneficiary.

**11.5** _Disclaimer of Administrative Powers_. The Trustee may disclaim, release, or restrict the scope of any power held in connection with any trust, including any administrative power, whether such power is expressly granted or implied by law, by a written instrument specifying the power to be disclaimed, released, or restricted and specifying the nature of any such restriction. All powers disclaimed or released by the Trustee shall lapse or expire and shall not be exercisable by any other person or fiduciary.

**11.6** _Trustee Powers - Fiduciary Role_. The Trustee shall exercise all powers in the Trustee's fiduciary capacity and only in such capacity. Further, the Trustee shall have no power under any such provision to enlarge or shift any of the beneficial interests under such trust, except as an incidental consequence of the discharge of the Trustee's fiduciary duties.

**11.7** _Compromise Claims_. The Trustee shall have the power to compromise, submit to arbitration, abandon, or otherwise adjust any claims or litigation against or in favor of the trust.

**11.8** _Litigation_. The Trustee shall have the power to commence or defend such litigation with respect to the trust or any property of the trust estate as the Trustee may deem advisable at the expense of the trust.

**11.9** _Conflicting Claims and Withholding Payment_. Upon the occurrence of any event requiring the Trustee to divide, segregate, or distribute the trust property, the Trustee may delay, without the payment of interest, the division, segregation, or distribution of all or any part of such property for such period of time as may be necessary to ascertain and provide for the payment of any tax, claim, or other liability against such property. However, this delay shall not affect the vesting of any interests or the accrual and payment of trust income to any Beneficiary.

**11.10** _Power to Deal with Trust_. The Trustee shall have the power to loan or advance the Trustee's own funds to the trust for any trust purpose with interest at current rates; to receive security for such loan in the form of mortgage, pledge, deed of trust or other encumbrance of any assets of the trust; to purchase assets of the trust at their fair market value as determined by an independent appraisal of those assets; and to sell property to the trust at a price not in excess of its fair market value as determined by an independent appraisal.

Exhibit 1-16

**11.11** <u>Power to Deal with Probate Estate</u>. The Trustee shall have the power to lend money to or to borrow money from the Executor of the Will of Settlor or the Administrator of the estate of Settlor, or the Trustee of any other trust created by this instrument, even though the Trustee of this trust and such Executor, Administrator or Trustee may be the same person or corporation, provided that all such loans shall be adequately secured and shall bear interest at a reasonable rate; to sell trust property to or to purchase property from the Executor of the Will of any Settlor or the Administrator of the estate of Settlor or the Trustee of any other trust created by this instrument, even though the Trustee of this trust and such Executor, Administrator or Trustee may be the same person or corporation, provided that such sales and purchases shall be made at the fair market value of the property as of the date of such sale.

**11.12** <u>Notice of Events</u>. Unless the Trustee receives written notice of the occurrence of an event affecting the beneficial interests in any trust held under this instrument, the Trustee shall not be liable to any beneficiary of such trust for any distributions made or other actions taken by the Trustee in good faith as though such event had not occurred.

**11.13** <u>Merger</u>. The Trustee may merge without court approval any trust under this instrument with any other trust otherwise created whose terms are substantially identical, providing that the Trustee, in the Trustee's reasonable discretion, determines that administration as a single trust will be consistent with the intent of the persons who established the trusts and will facilitate trust administration without defeating or impairing beneficial interests.

**11.14** <u>Construction</u>. All questions concerning the validity, construction, interpretation and administration of any trust under this instrument shall be governed by the laws of the State of California in force from time to time. This paragraph shall apply regardless of the situs of the trust estate or any change of residence of the Trustee or any beneficiary or the appointment or substitution of a Trustee residing or doing business in another state.

**11.15** <u>Severability</u>. If any provision in any trust created under this instrument is unenforceable, the remaining provisions shall nevertheless be carried into effect.

**11.16** <u>Effect of Contest</u>. If any devisee, legatee, or beneficiary of this trust or any trust created under this trust or any Will of the Settlor, or any legal heir of the Settlor or person claiming under any of them singly or in conjunction with any other person:

(a) Indirectly or directly contests or otherwise objects in any court to the validity or construction of any of the following documents or amendments thereto (hereafter "Document" or "Documents") or of any of their provisions:

(1) this trust, any other trust created pursuant to this trust, the Paul and Klara Szanto Revocable Trust dated March 19, 1991, any trust created pursuant to the terms fo that trust, the Settlor's Will, any beneficiary designation of an annuity, retirement plan, IRA, Keogh, pension or profit-sharing plan or insurance policy signed by the Settlor, a buy-sell agreement or any term contained in a buy-sell agreement signed by the Settlor, a partnership agreement, limited liability company operating agreement, a trust agreement, or any other entity

Exhibit 1-17

agreement or related operating agreement signed or established by the Settlor; a property agreement characterizing property as either community, joint tenancy, tenancy in common, separate, or some other character, or

(b) Objects or otherwise contests to the valuation of an asset proposed in good faith by a fiduciary of any of the Documents;

(c) Claims an interest in any property alleged by a fiduciary of any of the Documents;

(d) Seeks to obtain an adjudication in any court proceeding that a Document is void, or otherwise seeks to void, nullify or set aside a Document (or any of its provisions);

(e) Filing a creditor's claim or the prosecution of a suit based on a creditor's claim filed in a probate of the Settlor's estate against the trust estate, or any other Document (unless the claim is based on a debt in which Victor Szanto was involved);

(f) Files a petition or other pleading to change the character (community, separate, joint tenancy, tenancy in common, partnership, domestic partnership) of property already characterized by a Document;

(g) Claims ownership to any asset held in joint tenancy by the Settlor, other than as a surviving joint tenant;

(h) Files a petition to determine domestic partnership property for cohabitants relating to the Settlor;

(i) Files a petition for probate homestead in a probate proceeding of the Settlor's estate;

(j) Files a petition for family allowance in a probate of the Settlor's estate; or

(k) Participates in any of the above actions in a manner adverse to the trust estate, such as conspiring with or assisting any person who takes any of the above actions,

then the right of such person to take any interest given to him or her under this trust or any trust created pursuant to this trust shall be determined as it would have been determined had such person predeceased the Settlor without surviving issue. The Trustee is hereby authorized to defend, at the expense of the trust estate, any contest or other attack of any nature upon any provision of any Document. Notwithstanding the foregoing, a "contest" shall also include any action described above in an arbitration proceeding and shall not include any action described above solely in a mediation not preceded by the filing of a contest with the court. In the event any provision of this paragraph is held to be invalid, void, or illegal, the same shall be deemed severable from the remainder of the provisions of this paragraph. If such provision shall be

Exhibit 1-18

deemed invalid due to its scope and breadth, such provision shall be deemed valid to the extent of its scope or breadth permitted by law.

**11.17** <u>Allocation of Generation-Skipping Tax Exemption</u>.

(a) The person having the authority to allocate the GST Exemption of the Settlor shall allocate that Exemption as such person determines except as provided in subparagraph (b) below.

(b) If a descendant of the Settlor has the authority to allocate the GST Exemption, such descendant shall allocate the GST Exemption in the following order:

(1) Proportionately among direct skips made by the Settlor;

(2) To the trust or trusts to which the trust is transferred after the Settlor's death;

(3) Proportionately to all other generation-skipping transfers made by the Settlor; and

(4) Proportionately to all other transfers made by the Settlor which could be subject to the generation-skipping transfer tax.

(c) For purposes of this section, "direct skips" shall not include those resulting from a disclaimer.

**11.18** <u>Word Usage; Headings</u>. As used herein, the masculine, feminine or neuter gender in the singular or plural number shall include the others whenever the context requires. Headings are for convenience only and are not intended to affect the interpretation hereof.

**Section 12. OFFICE OF TRUSTEE**

**12.1** <u>Nomination of Trustee</u>. For the trusts specified below, the Initial Trustee and Successor Trustee shall be those persons named below. Each Successor Trustee shall serve in the order designated if the prior Trustee declines to act, resigns, or for any other reason ceases to act. If a co-Trustee declines to act, resigns or for any other reason ceases to act and fails to appoint his or her successor Trustee, the other co-Trustee(s) shall act as sole Trustee.

**12.2** <u>Paul Szanto Survivor's Trust</u>. Paul Szanto and Victor Szanto shall act as Co-Trustees. If the Settlor ceases to act as Co-Trustee, then Victor Szanto shall act as sole Trustee. If Victor Szanto ceases to act as Co-Trustee, the Settlor and Anthony Szanto shall act as Co-Trustee. If both the Settlor and Victor Szanto cease to act, then Anthony Szanto shall act as Successor Trustee. If both Victor Szanto and Anthony Szanto cease to act as Co-Trustee, then the Settlor and Greater Bay Trust Company shall act as Co-Trustee. If neither the Settlor, Victor Szanto, nor Anthony Szanto are acting as Trustee, then Greater Bay Trust Company shall act as Sole Trustee.

Exhibit 1-19

**12.3** <u>Trusts for Barbara Alexander</u>. The following persons shall act as the Initial Trustee and Successor Trustee of each separate trust created by this instrument for the benefit of Barbara Alexander in the order designated:

| | |
|---|---|
| Initial Trustee: | Victor A. Szanto |
| First Successor Trustee: | Anthony Szanto |

Victor A. Szanto may appoint a second Successor Trustee to act if both he and Anthony Szanto cease to act. If he fails to appoint a successor Trustee, then Greater Bay Trust Company shall act as Successor Trustee if he and Anthony Szanto ceases to act.

**12.4** <u>Trusts for Grandchildren of Settlors</u>. The following persons shall act as the Initial Trustee and Successor Trustee of each separate trust created by this instrument for the benefit of a grandchild of the Settlors in the order designated:

| | |
|---|---|
| Initial Trustee: | Victor A. Szanto |
| First Successor Trustee: | Anthony Szanto |

Victor A. Szanto may appoint a second Successor Trustee to act if both he and Anthony Szanto cease to act. If he fails to appoint a successor Trustee, then Greater Bay Trust Company shall act as successor Trustee if he and Anthony Szanto cease to act. Notwithstanding the above, Evye Szanto shall act as Initial Trustee for any trust created by this instrument for the benefit of a child of Victor Szanto and if she fails to qualify or ceases to act, then Stuart Licht shall act as Successor Trustee.

**12.5** <u>Resignation</u>. Any Trustee may resign at any time from any trust under this instrument. The resigning Trustee shall give written notice of the resignation by personal delivery or registered mail to all current income beneficiaries. The resignation shall be effective on the qualification of a Successor Trustee. The designated Successor Trustee shall act as Trustee upon acceptance of the appointment.

**12.6** <u>Disability</u>. If any individual Trustee is unable to participate in trust activities because of illness, disability, or any other reason, the designated Successor Trustee may, during any incapacity, make any and all decisions regarding the trust estate as though such person were the sole Trustee. In determining whether the individual Trustee is unable to participate in trust activity, the Successor Trustee may rely on a certificate or other written statement from a licensed physician who has examined the individual Trustee. In the absence of such a certificate or statement, the Successor Trustee shall petition a court of competent jurisdiction for authority to proceed as Successor Trustee. The Successor Trustee shall incur no liability to any beneficiary of the trust or to the Trustee who is replaced as a result of any action taken under this provision.

**12.7** <u>Individual Trustee's Unavailability</u>. Any individual Trustee shall have the power to delegate temporarily to the co-Trustee or Successor Trustee all or any of his or her powers during temporary periods of unavailability. The individual Trustee shall exercise this power of delegation by written notice to the co-Trustee or Successor Trustee specifying the powers

Exhibit 1-20

delegated. This delegation shall terminate on delivery of written notice by the individual Trustee to the co-Trustee or Successor Trustee of termination of delegation. The individual Trustee shall incur no liability to any beneficiary of the trust estate as a result of actions taken or not taken within the scope of delegation during the period of delegation.

**12.8** <u>Trustee Appointment Provisions.</u>

(a) Unless otherwise stated, each person, entity or court given the right to appoint a Trustee shall have the following powers in exercising such right of appointment: (1) The right to appoint one Trustee; (2) The right to appoint an individual or corporate Trustee; (3) The right to fill a vacancy in such trusteeship which results from the appointed person declining to act, resigning, or for any other reason ceasing to act as Trustee of such trust; and (4) The right to modify or revoke a previous appointment made by such person.

(b) The appointment of a Trustee shall be made by a written instrument signed and dated by such person and delivered to the current Trustee and the appointed Trustee. The appointment of a Trustee by a person having the right to appoint the Trustee shall be effective as of the date, or upon the occurrence of the event, which is specified in the written instrument.

(c) A court of competent jurisdiction shall have the right to determine the effectiveness of the appointment of any Trustee and shall have the right, upon the petition of any interested person, to appoint a Trustee, after consideration of the preference of the current income beneficiaries of the trust, if all trustees named or appointed decline to act, resign, or for any other reason cease to act as Trustee.

**12.9** <u>Action by More than One Trustee.</u> While more than one individual and or entity is acting as Trustee, either one of them shall have the power to bind the trust in any transaction. Except as set forth above, any action by a majority of the Trustees shall be binding on the trust estate and may be relied upon by third parties dealing with the Trustees. The nonconsenting Trustees shall not be liable for the action of the majority. Notwithstanding the foregoing, the Trustees may establish one or more bank accounts in the name of one or more of the co-Trustees, which accounts may provide for the withdrawal by the signature of one or more of the co-Trustees.

**12.10** <u>Compensation.</u> A Trustee may pay his, or her, or itself reasonable compensation from the trust estate during each calendar year for all ordinary services and reasonable additional compensation for any extraordinary services, all without court order. While either Victor A. Szanto or Anthony Szanto is acting as Trustee or co-Trustees of the Paul Szanto Survivor's Trust or any trust created under this instrument, the compensation to the Trustee or Trustees shall be two (2) percent of the gross value of each trust. If the Trustee shall serve for a part of a calendar year, the annual compensation shall be prorated. Any individual who acts as Trustee of any trust established by this instrument and who renders services (individually, or as a shareholder, member, partner, associate or employee of any firm) in another capacity (such as an accountant, investment adviser or stock broker) to or for the benefit of any such trust shall be entitled to reasonable compensation in both capacities. Under no circumstances shall compensation otherwise due to an individual for services as Trustee be reduced or otherwise affected by the

Exhibit 1-21

fact that such individual is entitled compensation in another capacity; provided, however, that this provision shall not apply to an attorney who shall only be entitled to compensation as Trustee and not as attorney.

**12.11** <u>Compensation</u>. A Trustee may pay his, or her, or itself reasonable compensation from the trust estate during each calendar year for all ordinary services and reasonable additional compensation for any extraordinary services, all without court order. If the Trustee shall serve for a part of a calendar year, the annual compensation shall be prorated. Any individual who acts as Trustee of any trust established by this instrument and who renders services (individually, or as a shareholder, member, partner, associate or employee of any firm) in another capacity (such as an accountant, investment adviser or stock broker) to or for the benefit of any such trust shall be entitled to reasonable compensation in both capacities. Under no circumstances shall compensation otherwise due to an individual for services as Trustee be reduced or otherwise affected by the fact that such individual is entitled compensation in another capacity; provided, however, that this provision shall not apply to an attorney who shall only be entitled to compensation as Trustee and not as attorney.

**12.12** <u>Exculpatory Clause</u>. No Trustee shall be liable to any person interested in this trust for any act or default unless it results from the Trustee's bad faith, willful misconduct, or gross negligence. Any successor Trustee may accept as correct any accounting of trust assets made by any predecessor Trustee. However, a successor Trustee may institute any action or proceeding for the settlement of the accounts, acts, or omissions of any predecessor Trustee.

**12.13** <u>Bond</u>. No bond shall be required of any person, including non-residents, named or appointed as Trustee of any trust created under this instrument.

Effective on December 3 1, 2005, at _Red Bluff_, California.

SETTLOR:                                              TRUSTEE:

_____                    _____
Paul Szanto                                             Paul Szanto

                                                               _____
                                                               Victor Szanto

                                                               _____
                                                               Anthony Szanto, resigning Trustee

Exhibit 1-22

Case 16-03114-pcm    Doc 23    Filed 11/15/16

STATE OF CALIFORNIA          )
                            ) ss.
COUNTY OF Tehama            )

On December 31, 2005, before me, Valerie Coon, a Notary Public, personally appeared Paul Szanto, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Valerie Coon_          (Seal)

VALERIE COON
COMM. #1448618
NOTARY PUBLIC - CALIFORNIA
SHASTA COUNTY
MY COMM. EXPIRES NOV. 29, 2007

STATE OF CALIFORNIA          )
                            ) ss.
COUNTY OF Tehama            )

On December 31, 2005, before me, Valerie Coon, a Notary Public, personally appeared Victor Szanto, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Valerie Coon_          (Seal)

VALERIE COON
COMM. #1448618
NOTARY PUBLIC - CALIFORNIA
SHASTA COUNTY
MY COMM. EXPIRES NOV. 29, 2007

STATE OF CALIFORNIA          )
                            ) ss.
COUNTY OF Marin            )

On January 09/06, before me, Martha Romero, a Notary Public, personally appeared Anthony Szanto, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Martha Romero_          (Seal)

MARTHA ROMERO
Commission # 1547376
Notary Public - California
Marin County
My Comm. Expires Feb 24, 2009

122705trust.Szanto

23

Exhibit 1-23



Filed 3/11/08

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

> **Court of Appeal, First Apellate District**
> **FILED**
> MAR 1 1 2008
> Diana Herbert, Clerk
> by _____ Deputy Clerk

Estate of KLARA SZANTO, Deceased.

PETER SZANTO,

    Appellant,

v.

PAUL SZANTO et al..,

    Respondents.

A116147

(San Mateo County
Super. Ct. No. 115212)

## I.    INTRODUCTION

Klara Szanto died on December 5, 2005. Thereafter, Klara's husband Paul and their son Victor filed a petition to confirm that Klara and Paul's home in Hillsborough (the Hillsborough property) was an asset of the Paul and Klara Szanto Revocable Trust (the Szanto Trust). Peter Szanto, another son of Klara and Paul, responded by filing a petition under Probate Code section 21320 (section 21320), pursuant to which he sought declaratory relief that he could oppose the trust asset petition without violating a "no contest" provision in Klara's will.[1] The probate court filed an order confirming that the Hillsborough property was a trust asset and denying Peter's section 21320 petition. We reverse the part of the order confirming that the Hillsborough property is a trust asset but otherwise affirm.

# EXHIBIT 2-1

---

[1] Because the parties to this appeal share the same surname, we will refer to these individuals by their first names.

## II.    STATEMENT OF FACTS

**A.    *The Trust Asset Petition***

On May 17, 2006, respondents filed a Petition for Order Confirming Transfer of Trust Asset.  According to the petition, Paul and Victor are co-trustees of the Szanto Trust, pursuant to the operative trust document which is dated March 19, 1991, Restated on October 5, 2005.

The petition sets forth the following allegations regarding Paul and Klara's Hillsborough property.  On September 15, 2004, Paul and Klara executed a grant deed transferring title to the real property from themselves "as husband and wife, as Joint Tenants," to themselves as trustees of the Szanto Trust.  On August 31, 2005, Klara and Paul, as trustees of the Szanto Trust, transferred all of their interest in the Hillsborough property to themselves as "Husband and Wife, as Joint Tenants."  The August 31, 2005, transfer was made to comply with the request of a mortgage company "solely for the purpose of refinancing," and both Paul and Klara understood that "their property was to be retitled back to their trust once the financing was in place."  The petition does not address why a formal transfer was not accomplished prior to Klara's death.

Respondents sought an order, allegedly pursuant to *Estate of Heggstad* (1993) 16 Cal.App.4th 943 (*Heggstad*), that the Hillsborough property is an asset of the Szanto Trust.  Respondents further alleged that Klara's will, dated September 15, 2000 (the 2000 will), provides that all her property be distributed to the Szanto Trust.  Therefore, respondents alleged, granting their "*Heggstad* petition" would effectuate Klara's intent and avoid the expense of a probate.  Respondents stated that, if their petition was denied, they would initiate probate in which case Klara's interest in the Hillsborough property would pass to the Szanto Trust, but at "additional expense to the Trust."

EXHIBIT B-2

**B.     *Peter's Request for a Continuance***

A hearing on respondents' trust asset petition was scheduled for June 19, 2006. On June 1, 2006, Peter filed, pro per, an ex-parte request for a continuance.[2]  Peter argued the petition was deceptive on its face and that he needed additional time to explore the relevant issues and determine the potential impact of the respondents' proposed actions. Peter also argued that respondents' petition could affect his rights in an action he had filed against his parents and the Szanto Trust in the federal district court in Nevada. According to Peter, there was a pending motion to dismiss the Szanto Trust from the federal action and, if that motion was granted and the trust asset petition in this case was also granted, then Paul and Klara's most valuable asset would not be available to satisfy any potential judgment he might obtain.  According to Peter, the Hillsborough property is valued at approximately $12 million.

The appellate record reflects that Peter's ex parte request for a continuance was denied, although the details pertaining to that determination are not available to us.

**C.     *Peter's First "Response" to Respondents' Petition***

On June 14, 2006, Peter filed, again pro per, a pleading which was referenced as a "Response" to the trust asset petition, accompanied by a citation to section 21320.  In this short document, Peter alleged he is a beneficiary of the Szanto Trust "as published on September 26, 1996," and he sought declaratory relief that filing an opposition to the trust asset petition would not constitute a will contest within the meaning of section 21320.

A hearing on the trust asset petition commenced on June 19, 2006, before the Honorable Robert D. Foiles.  At the hearing, Peter requested additional time so he could "prepare an opposition under the safe harbor protection of 21320."  Respondents objected to a continuance and further argued that Peter had failed to show how or why section

---

[2] That same day, Peter filed a request that the Honorable Rosemary Pfeiffer be disqualified from sitting as a judge in this case on the ground she had "previously demonstrated unreasonable bias" against Peter in an unrelated child support action. Although disagreeing with the factual basis for this request, Judge Pfeiffer recused herself in order to further the interests of justice.

EXHIBIT 2-3

21320 could be applied here.  Over respondents' objection, the court granted Peter a continuance so that he could file a proper petition under section 21320.

**D.**   *Peter's Second Response and Petition*

On June 21, 2006, Peter filed a pleading captioned as "1. Response to Petition for Order Confirming Transfer of Trust Asset  2. Petition for Declaratory Relief  3. Points and Authorities in Support of Declaratory Petition."  The stated purpose of Peter's pleading was as follows:  "The intent of this petition is to seek a declaration from this Court as to one matter only.  A declaration pursuant to <u>Probate Code</u> § <u>21320</u> that if petitioner contests the present Petition for Order Confirming Transfer of Trust Asset, that contest would be no 'will contest' within the meaning of either of the wills of Klara Szanto as published on September 26, 1996 (Exhibit 2) or as published on September 15, 2000 (Exhibit 3)."  Peter alleged that he was entitled to a section 21320 declaration because he is a beneficiary of the Szanto Trust.

Peter maintained that his mother had left two potentially valid wills, the 2000 will referenced in respondents' petition and an earlier will, executed on September 26, 1996 (the 1996 will).  Peter did not acknowledge the validity of either will but did acknowledge that both provided that Klara's estate was to be transferred into the Szanto Trust, and that both contained no contest clauses.  Therefore, Peter sought confirmation that opposing respondents' petition would not constitute a will contest.

Peter alleged that he would not attack the validity of the Szanto Trust or of either of Klara's wills.  Instead, he intended only to "test the sufficiency, as a matter of law . . . of the [petition]."  However, at another point in his very confusing pleading, Peter stated that he "seeks to present this Court with other aspects of Klara Szanto's year 2000 Will which are in defiance of public policy, and hence void, as they apply to the Petition to Transfer Trust Asset."  At another point, Peter argued that any challenge that he might make to the respondents' petition which proved successful would necessarily be for the betterment of Klara's estate and, therefore, could not be found to thwart Klara's testamentary intent.

4



EXHIBIT **2-4**

Peter did not clearly articulate any specific ground for objecting to the respondents' petition. He argued instead that the petition was confusing because it contained ambiguous language and that it was deceptive because it did not disclose that, before the petition was filed, Victor obtained Paul's durable power of attorney. Peter questioned why this allegedly "crucial information" was kept from the court. Peter opined that, if assured his challenge would not result in a forfeiture, he could reveal other "ambiguity and deception" in the respondents' petition. Finally, Peter stated that if he was given a "no contest" declaration, he would challenge what he "believes, in good faith, to be the multitude of misrepresentation of Klara Szanto's intent in both putative wills."

**E.** *The Trial Court's Ruling*

The hearing on both petitions was held before Judge Foiles on July 7, 2006.

At the hearing, Peter stated that his opposition to respondents' petition, should he be allowed to file one, would be that respondents were attempting to make "an end run around the probate and administration" of Klara's will. Apparently, Peter was concerned that the real purpose of the respondents' petition was to obtain a ruling from the court that the 2000 will was valid. Peter claimed that an order granting the petition would necessarily show that the 2000 will was valid and that respondents would then "us[e] this Court's blessing to validate the Will that they have yet administered or seek some sort of authentication for."

Peter also questioned respondents' allegation that the only reason the Hillsborough property was transferred out of the Szanto Trust was to obtain refinancing. He argued that Klara kept meticulous diaries and that those diaries should be produced so Klara's real intent could be determined. Peter further argued that he wanted to oppose respondents' petition so that "I can make clear that we need to decide which one of the Wills we're working under. I need to prove up to the Court the fraud, the undue influence that was exerted on my mother to sign the 2000 will, to sign the 2005 Trust and to make the actual intent of my mother known to the Court."

EXHIBIT 2-5

Respondents argued that Peter's claim that respondents were trying to make an end run around the probate law was unfounded. Because the Hillsborough property was transferred out of the Szanto Trust to Paul and Klara as joint tenants, with a right of survivorship, Klara's share of the property passed directly to Paul and was not subject to probate. Respondents further argued that, to the extent Peter admitted he intended to attack his mother's stated intentions, his proposed opposition would clearly be a contest.

At the conclusion of the hearing, the court granted respondents' petition and denied Peter's petition without making a finding as to whether the latter constituted a will contest. Instead, the court denied the section 21320 petition on "procedural grounds."

An order granting respondents' petition and denying Peter's section 21320 petition was filed September 12, 2006. That order sets forth findings, including that (1) Paul and Klara transferred the Hillsborough property into the Szanto Trust on September 15, 2004; (2) Paul and Klara transferred the Hillsborough property out of the Szanto Trust to "Paul Szanto and Klara Szanto, Husband and Wife as Joint Tenants" on August 31, 2005; (3) "In compliance with the request of the mortgage company, title was changed to Joint Tenancy by Paul Szanto and Klara Szanto solely for the purpose of refinancing"; (4) the Hillsborough property is an asset of the Szanto Trust.

### III. DISCUSSION

**A.** *Peter's Petition*

Peter contends his section 21320 petition for declaratory relief was erroneously denied. We review de novo the order denying Peter's petition. (*Hearst v. Ganzi* (2006) 145 Cal.App.4th 1195, 1209; *Estate of Davies* (2005) 127 Cal.App.4th 1164, 1173.)

Section 21320, subdivision (a), states: "If an instrument containing a no contest clause is or has become irrevocable, a beneficiary may apply to the court for a determination of whether a particular motion, petition, or other act by the beneficiary, including, but not limited to, creditor claims under Part 4 (commencing with Section 9000) of Division 7, Part 8 (commencing with Section 19000) of Division 9, an action pursuant to Section 21305, and an action under Part 7 (commencing with Section 21700) of Division 11, would be a contest within the terms of the no contest clause."

6

EXHIBIT 2-6

"[S]ection 21320 provides a safe harbor for beneficiaries who seek a judicial determination whether a proposed legal challenge would be a contest, and that is the only issue to be decided when such an application is made. [Citation.]" (*Estate of Davies, supra,* 127 Cal.App.4th at p. 1173.) The question whether an action constitutes a contest " 'within the meaning of a particular no-contest clause depends upon the circumstances of the particular case and the language used.' [Citations.] '[T]he answer cannot be sought in a vacuum, but must be gleaned from a consideration of the purposes that the [testator] sought to attain by the provisions of [his] will.' [Citation.]" (*Burch v. George* (1994) 7 Cal.4th 246, 254-255; see also *Estate of Coplan* (2004) 123 Cal.App.4th 1384, 1388.)[3]

"As a general rule, the decision about whether the beneficiary's proposed action would be a will contest may not involve a determination of the merits of the action itself, a rule that 'makes sense' because the summary safe harbor procedure could otherwise 'be used to allow the very form of challenge and protracted litigation the testator sought to prevent.' [Citation.]" (*Estate of Davies*, *supra*, 127 Cal.App.4th at p. 1173.) Furthermore, "specificity is important because the trial court must be able to determine from the section 21320 application whether the proposed action is entitled to safe harbor." (*Estate of* Rossi (2006) 138 Cal.App.4th 1325, 1334.)

These rules demonstrate that Peter failed to file a proper application for section 21320 declaratory relief and that the trial court properly denied it. As noted above, the only function of section 21320 is to permit a *beneficiary* to seek a judicial determination whether *a proposed legal challenge* would be a contest. (*Estate of Davies*, *supra,* 127 Cal.App.4th at p. 1174.) Indeed, by its express terms, this statute permits a beneficiary of an irrevocable will or trust to obtain a determination as to whether a "particular" motion,

---

[3] "Therefore, even though a no contest clause is strictly construed to avoid forfeiture, it is the testator's intentions that control, and a court 'must not rewrite the [testator's] will in such a way as to immunize legal proceedings plainly intended to frustrate [the testator's] unequivocally expressed intent from the reach of the no-contest clause.' [Citation.] (*Burch v. George*, *supra*, 7 Cal.4th at p. 255.)

EXHIBIT 2-7

petition or other act would constitute a contest within the terms of the no contest clause in the irrevocable instrument with respect to which the petitioner is a beneficiary.

In this case, Peter alleged he is a beneficiary of the Szanto Trust. However, the evidence before the court showed that Peter is not such a beneficiary.[4] Further, even if Peter could have proven otherwise, he did not seek a no contest finding with respect to the Szanto Trust. Instead, he attempted to obtain such a finding with respect to one or both of his mother's wills. Peter did not allege that he was a beneficiary under either the 1996 will or the 2000 will or that either will was irrevocable. Furthermore, Peter did not seek a declaration with respect to a "particular" motion, claim or other act. Instead, he essentially sought carte blanche to use the respondents' trust asset petition as a venue to challenge any conceivable action by Paul, Klara or Victor which related in any way to Klara's will(s) or the Szanto Trust. Contrary to Peter's contention on appeal, the lower court was not required to provide such a declaration.

As noted above, "specificity" is important so the court can determine whether the proposed action will constitute a contest. (*Estate of Rossi*, *supra*, 138 Cal.App.4th at p. 1334.) Indeed, it is considered "good practice" for a proposed pleading to be attached to or filed concurrently with the section 21320 application. (Ross, Cal. Practice Guide: Probate (The Rutter Group Rev. #1 2007) p. 15-40.6, ¶ 15:98.6a.) Here, we do not hold that Peter was required to submit a proposed opposition to the trust asset petition in order to obtain a safe harbor declaration. We do hold, however, that a court must be able to determine the substantive action the applicant intends to take. In this case, Peter's section 21320 petition was so vague and confusing that it simply was not possible to determine what substantive action Peter proposed to take.

For all these reasons, we hold Peter's petition was properly denied.

---

[4] In their trust document, Paul and Klara provided that their assets were to be allocated among their children, identified Peter as one of their children, but directed that the share of their property allocated to Peter was to be distributed to Peter's children.

EXHIBIT 2-8

**B.** *The Trust Asset Petition*

Peter contends the respondents' trust asset petition should have been denied. It appears that his primary contention is that respondents erroneously relied on *Heggstad*, *supra,* 16 Cal.App.4th 943. Respondents characterized their lower court petition as a "*Heggstad* petition" and, on appeal, maintain that that case is authority for the lower court order granting their petition. We disagree.

The issue in *Heggstad* was whether the decedent had created a revocable living trust in real property. (16 Cal.App.4th at p. 947.) Prior to his death, the decedent had executed a trust instrument which named himself as the trustee and which identified all the trust property in a schedule which was attached to the trust instrument. The real property at issue was listed on the attached schedule. However, the decedent did not execute a grant deed conveying this property to himself as trustee of the revocable trust. (*Id*. at p. 946.) This court held that "a written declaration of trust by the owner of real property, in which he names himself trustee, is sufficient to create a trust in that property and that the law does not require a separate deed transferring the property to the trust." (*Id*. at p. 950.)

We confess that we are perplexed as to why respondents refer to their lower court petition as a "*Heggstad* petition." Respondents did not seek a ruling from the probate court as to whether a revocable trust in real property had been created. Indeed, there appears to be no dispute that the Szanto Trust was created, that the Hillsborough property was an asset of that trust, and, indeed, that Paul and Klara executed a deed transferring this asset to themselves as trustees of the Szanto Trust. The potential problem respondents addressed by their lower court petition was whether the Hillsborough property was still an asset of the Szanto Trust at the time of Klara's death in light of events that occurred after the revocable trust in real property was created. No comparable issue was presented to us in *Heggstad, supra*, 16 Cal.App.4th 943.

On appeal, respondents contend that *Heggstad* does support their claim that the Hillsborough property is part of the Szanto Trust. They reason that *Heggstad* holds that a settlor can establish a revocable trust in real property without executing a deed so long as

9

EXHIBIT 2-9

he or she manifests trust intent by declaring him or herself trustee. Therefore, respondents argue, it necessarily follows that a settlor can include real property in a trust that has already been established simply by expressing an intent to do so.

Respondents misconstrue our holding in *Heggstad*. We found that a deed was not required in that case because relevant authority established that a *written declaration* of trust was a legitimate alternate method by which a settlor could manifest his intention to create a trust in his real property. (*Heggstad, supra*, 16 Cal.App.4th at p. 948.) Thus, to the extent *Heggstad* can be applied to a case in which a settlor has attempted to transfer real property into an already established inter vivos trust, our decision would require either a deed or a written declaration that the property was a trust asset. Nothing in *Heggstad* supports the notion respondents advance here, i.e., that the Hillsborough property can be declared an asset of the Szanto Trust simply upon a showing that Paul and Klara intended to, but never did, transfer the property back into the trust after the refinancing had taken place.

As we discussed in *Heggstad*, "[w]here the trust property is real estate, the statute of frauds requires that the declaration of trust must be in writing signed by the trustee." (16 Cal.App.4th at p. 948.) Respondents acknowledge this rule but find it does not undermine their request for relief because "[t]he trust instrument here was signed by Paul and Klara." Of course, though, that document was signed before Paul and Klara executed the deed transferring the Hillsborough property out of the Szanto Trust. There is no evidence, nor even a contention by respondents, that Paul and Klara made a written declaration of trust after they formally transferred the property out of their trust.

Therefore, *Heggstad* does not support a finding that Paul and Klara transferred the Hillsborough property into the Szanto Trust prior to Klara's death. Indeed, had the trial court made such a finding, we could not affirm it. But, as it happens, the court did not find that Paul and Klara transferred the Hillsborough property into their trust, nor did it rely on or even refer to *Heggstad*. The court simply found that the Hillsborough property is an asset of the Szanto Trust. We must, therefore, consider whether the record before us supports that conclusion.

EXHIBIT 2-10

The evidence presented below established that, at the time of Klara's death, Paul and Klara owned the Hillsborough property as "Husband and Wife as Joint Tenants." " 'A distinctive feature of joint tenancy, as opposed to other interests in land, is the right of survivorship. This means that when one joint tenant dies, the entire estate belongs automatically to the surviving joint tenant(s). [Citations.]' (*Grothe v. Cortlandt Corp.* (1992) 11 Cal.App.4th 1313, 1317.)" (*Estate of Mitchell* (1999) 76 Cal.App.4th 1378, 1385.) Therefore, one could argue that when Klara died, the entire Hillsborough property belonged "automatically" to Paul, the surviving joint tenant. Indeed, as noted in our factual summary, respondents made this argument at the July 7, 2006 hearing. Furthermore, in his appellate brief, Peter states his father is the "fee-simple-absolute owner" and the "sole owner" of the Hillsborough property.[5]

If Paul is the sole owner of the Hillsborough property, he had the authority to transfer that asset into the Szanto Trust. However, there is neither evidence nor even an allegation that Paul made such a transfer. Further, we must again conclude that the principles we discussed in *Heggstad, supra*, 16 Cal.App.4th 943, could not apply here. Arguably, the trust asset petition, which Paul verified, might constitute a written declaration of trust by the owner of the real property. However, Victor is now a co-trustee along with his father. In other words, this is not a case in which the owner of real property creates a trust in his own real property simply by declaring himself trustee of it. To accomplish a transfer of the Hillsborough property into the Szanto Trust, title to the property must be conveyed to both Paul *and* to Victor as trustees. There is no evidence in the record that such a conveyance occurred.

For all these reasons, we find that the respondents' petition should have been denied.

---

[5] On appeal, respondents change their position and contend that the Hillsborough property may not have passed directly to Paul upon Klara's death because it may have been a community property asset notwithstanding the joint tenancy deed. Nothing we say in this opinion should be construed as resolving this issue which, as best we can determine, has not yet been properly raised in the lower court.

EXHIBIT 2-11

## IV.   DISPOSITION

The part of the probate court's order granting respondents' petition for an order confirming transfer of trust asset is reversed.  The part of the order denying appellant's section 21320 petition is affirmed.  The parties are to bear their own costs on appeal.


_____
Haerle, J.


We concur:


_____
Kline, P.J.


_____
Lambden, J.

EXHIBIT 2-12

James J. Rankl, Esq.
Nevada Bar No. 1156
300 West Second Street
Carson City, NV 89703
(775) 882-6450
(775) 883-1987 (fax)
Attorney for Defendants

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

PETER SZANTO,

                    Plaintiff,

vs.

MARINA MARKETPLACE 1, LLC, et al.,

                    Defendants.

Case #3:11-CV-00394-RCJ-(VPC)

ORDER

I.    Procedural History

On June 4, 2014, Defendants Victor Szanto and Evye Szanto ("Defendants") moved for dismissal of the second amended complaint pursuant to FRCP 12 upon the ground that Defendants were not personally served on April 11, 2014, as claimed by Plaintiff and therefore there was no personal jurisdiction.  Defendants' motion was supported by their affidavits and other documents supporting their assertion that they were in New Delhi, India on April 11, 2014.  In response Plaintiff offered the affidavits of personal service signed by Jared Phillips, a process server hired by Plaintiff and presented arguments that the affidavits and documents submitted by Defendants were false and/or forged.  In light of the conflicting

EXHIBIT 3-1

evidence the Court issued a Minute Order setting an evidentiary hearing on the question of whether Defendants were personally served on April 11, 2014, at the Starbucks coffee shop located at 4000 S. Lake Tahoe Blvd., South Lake Tahoe, California, and further ordered the appearance of the parties at the evidentiary hearing.

On July 21, 2014, the Court held a lengthy evidentiary hearing on the issue of whether Defendants were personally served on April 11, 2014.   At the hearing Defendants testified that they were not personally served on April 11, 2014, and on that date they were in New Delhi, India.  In support of their testimony Defendants produced their passports and visas indicating their arrival in India on April 11, 2014, and return to the Unites States on April 30, 2014.  Defendants also produced copies of airline tickets, hotel invoices and other documents to prove their presence in India on April 11, 2014.

Plaintiff offered no evidence of service on April 11, 2014, other than the previously filed affidavits of service.  More importantly Plaintiff failed to produce the process server to testify regarding the alleged service.  At the conclusion of the evidentiary hearing the Court found by a preponderance of the evidence that Defendants were not personally served on April 11, 2014 and were in fact in India. Based upon the evidence presented the Court concluded that Plaintiff's process server was mistaken about who he served if in fact he served anyone.  The Court further concluded that the record demonstrated that Plaintiff had years to serve Victor and Evye Szanto, but failed to do so.  On July 30, 2014, the Court issued its Order which in relevant part granted Defendants' Motion to Dismiss and dismissed

EXHIBIT 3-2

Defendants Victor and Evye Szanto as parties upon the ground that Plaintiff had failed to timely serve the Defendants.

On August 27, 2014, Plaintiff filed a Motion for Reconsideration (ECF No. 153) of the Court's Order Granting Defendants' Motion to Dismiss (ECF No. 137).   In relevant part Plaintiff alleged that reconsideration was warranted because Plaintiff recently discovered that the subject service of Defendants did not occur on April 11 as previously alleged, but actually occurred on April 1.  In support of the Motion for Reconsideration the process server attested that he actually served Defendants on April 1, 2014, but due to his sloppy handwriting in his original notes of service he mistakenly wrote April 11 on the affidavit of service instead of April 1.  In the Motion for Reconsideration Plaintiff also argued that the Court's consideration of Defendants' passports was a substantial error or law, Plaintiff misunderstood the purpose of the evidentiary hearing, the Court misapplied FRCP 4(m) and that Defendants were personally served in court after the evidentiary hearing on July 17, 2014.

Defendants opposed Plaintiff's Motion for Reconsideration on several grounds. Most importantly Defendants submitted their affidavits and the affidavit of a third party who was traveling with them, attesting that they were not in South Lake Tahoe on April 1, 2014 as alleged by Plaintiff's process server but were actually 230 miles away in Red Bluff, California on that date.

For the reasons set forth in the Court's Order dated October 15, 2014 (ECF No. 162) the Court rejected Plaintiff's claims of judicial error and judicial bias raised in Plaintiff's Motion for Reconsideration.   Additionally, the Court rejected Plaintiff's

EXHIBIT 3-3

claims that he was "surprised" about the purpose of the July 21, 2014 evidentiary hearing.

In light of the information provided in the process server's affidavit, and the affidavits submitted by Defendants disputing the fact of service the Court decided to give Plaintiff one final chance to demonstrate that Defendants were timely served. Accordingly the Court issued an Order (ECF No. 162) setting the time and date for an evidentiary hearing on whether Defendants were personally served on April 1, 2014. In that Order the Court specifically ordered that the parties and Plaintiff's process server, Mr. Phillips, attend the hearing.

The evidentiary hearing on whether Defendants were personally served on April 1, 2014, was held on November 17, 2014. Due to other matters on the Court's docket, the hearing scheduled for 10:00 AM began at 10:51 AM. In attendance at the hearing were Plaintiff, Defendants Victor and Evye Szanto, and Defendant's counsel. Plaintiff advised the Court that his process server, Mr. Phillips, was en route but had not yet arrived. The Court recessed at 11:00 AM to allow Mr. Phillips additional time to appear. At 11:24 AM the Court reconvened and Plaintiff informed the Court that Mr. Phillips had still not arrived, Plaintiff did not know Mr. Phillip's location and that Plaintiff had not been successful in reaching Mr. Phillips by telephone.

Counsel for Defendants noted for the record that Defendants and witness Austin Bell were present and prepared to testify in accordance with the affidavits submitted in support of their motion, that Defendants were not personally served on April 1, 2014, on April 1, 2014 Defendants were in Red Bluff, California and

EXHIBIT 3-4

Defendants were not present in South Lake Tahoe.   Counsel also noted the presence of John Barlow, owner of the Tehama Auto Center, who was prepared to testify about the purchase of a ball and hitch by Victor Szanto on April 1, 2014, in Red Bluff, California.

II.    Findings

Plaintiff has failed to produce Mr. Phillips on two separate occasions to testify regarding the alleged personal service on Defendants. In the first instance Plaintiff's claim of surprise that Mr. Phillips' testimony was necessary is simply not credible. Plaintiff had full knowledge of Defendants' assertion that they were in India on April 11, 2014, and the exhibits produced by Defendants prior to the hearing supported their assertion.  With respect to the second evidentiary hearng on November 17, 2014, the Court decided to eliminate the possibility of surprise, confusion and/or doubt by specifically ordering Plaintiff to produce Mr. Phillips at the hearing. Notwithstanding the Court's order, Plaintiff failed to produce Mr. Phillips at the evidentiary hearing on November 17, 2014.  At the time the Court concluded the hearing, Mr. Phillips was one and one-half hours late for the hearing and Plaintiff offered no credible explanation for his absence.

Other than the corrected affidavits of service signed by Mr. Phillips (ECF Nos. 147 and 148) and the Affidavit of Mr. Phillips filed in support of Plaintiff's Motion for Reconsideration (ECF No. 151) Plaintiff produced no other evidence in support of his new claim that Defendants were personally served on April 1, 2014.  Additionally the Court notes that Plaintiff did not include in his Motion for Reconsideration  any evidence to corroborate the alleged service on April 1, 2014.  Most notably, the

EXHIBIT 3-5

"notes" that Mr. Phillips allegedly misread were not produced.  Additionally, no evidence was presented to establish that Mr. Phillips was ever in South Lake Tahoe, California.  Plaintiff has not provided a credible explanation of why he hired a process server from Glendale, California, to serve two individuals who reside in Glenbrook, Nevada, or how the process server managed to locate the Defendants in a Starbucks in South Lake Tahoe, California.  The Court finds that Plaintiff and Mr. Phillips' claim of personal service on April 1, 2014 in a Starbucks at 4000 South Lake Tahoe Blvd., South Lake Tahoe, California, is not credible.

Mr. Phillips' claim that he misread his notes on service and read April 1 as April 11 is not credible.  The original affidavits of service (ECF Nos. 89 and 90) were dated April 11, 2014.  Assuming Mr. Phillips actually signed those affidavits on April 11, 2014, it is simply unbelievable that he did not realize that service actually occurred ten days earlier.

Defendants have presented credible evidence to the Court that on April 1, 2014, they were in Red Bluff, California and not present in South Lake Tahoe as claimed by Mr. Phillips.  The evidence includes Defendant Victor Szanto's sworn statement and an invoice for the purchase of a trailer hitch and ball from the Tehama Auto Center in Red Bluff, California on April 1, 2014.  Additionally, Defendants presented the Affidavit of Austin Bell which states that Mr. Bell accompanied Defendants on their trip to Red Bluff, California.  In support of his statement Mr. Bell produced a credit card charge for a purchase he made at the Home Depot in Red Bluff, California on April 1, 2014.

Based upon all the above, the Court finds that Defendants have proved by a

EXHIBIT 3-6

preponderance of the evidence that they were not personally served on April 1, 2014, at South Lake Tahoe, California.

The Court also finds that Plaintiff has falsely represented to the Court that Defendants were timely served on at least two separate dates. The Court has held two evidentiary hearings to allow Plaintiff the opportunity to demonstrate that Defendants were personally served. Plaintiff failed to produce his process server at the first hearing and again at the second hearing despite the specific order requiring the process server's attendance. At each hearing Defendants demonstrated that the alleged service on April 11, 2014 and April 1, 2014 did not occur.

III.   Legal Conclusions

For the reasons stated above Plaintiff has failed to demonstrate grounds for reconsideration of, or relief from, the Court's prior order (ECF No. 137) granting Defendants' motion to dismiss for lack of personal jurisdiction due to the failure to effect service of process on Defendants Victor Szanto and Evye Szanto.

With respect to the Court's prior decision to not grant Plaintiff additional time for service of the complaint, Plaintiff has failed to provide any grounds to warrant reconsideration. The record demonstrates that the original complaint was filed June 3, 2011 and in separate minute orders issued July 18, 2012 and July 17, 2013, Plaintiff was warned that the case would be dismissed for want of prosecution. Plaintiff's second amended complaint was filed December 30, 2013. As of the date of the first evidentiary hearing on July 17, 2014, 214 days had passed since the filing of the second amended complaint.

EXHIBIT 3-7

Plaintiff's argument notwithstanding, the Court has not misconstrued FRCP 4. Strict compliance is required with the rules governing service.  Strict compliance of service requirements is not excused by defendants actual notice of lawsuit, or that service was "close" to satisfying FRCP4 requirements.  Mid Continent Wood Products, Inc. v. Harris, 936 F.2d 297, 301 (7th Cir. 1991).  Strict compliance is required even for pro se plaintiffs.  Albra v. Advan, Inc., 490 F.3d 826, 829 (11th Cir. 2007); see also Judith v. FCC, 276 FRD 1 (D.D.C. 2011) (Although pro se litigants are allowed more latitude to correct defects in service they still must comply with the requirements for service of process).

This is not a case in which service was close to satisfying the requirements of FRCP 4 or simply a matter of correcting a defect in service.  As discussed above Plaintiff has twice falsely represented to the Court that Defendants Victor and Evye Szanto were personally served.  While Plaintiff did accomplish personal service on July 21, 2014, said service occurred 214 days after the filing of the second amended complaint.  FRCP 4(m) mandates that if service is not accomplished within 120 days after filing the complaint the action must be dismissed.

Plaintiff was twice warned by the Court that his failure to timely prosecute this matter will result in dismissal of the action.  The service on July 21, 2014 occurred more than three years after filing the original complaint, approximately 282 days after filing the first amended complaint and 214 days after filing the second amended complaint.  Good cause does not exist to warrant granting Plaintiff additional time to effect service.

Finally, as set forth in the Court's prior Orders Plaintiff's second amended

EXHIBIT 3-8

complaint does not allege any wrongdoing by Marina Marketplace 2 ("MM2").  With the dismissal of Defendants Victor and Evye Szanto, Plaintiff cannot prove his claim of fraudulent transfer against MM2.

<u>CONCLUSION</u>

IT IS HEREBY ORDERED that Plaintiff's Motion for Reconsideration (ECF No. 153) is denied.

IT IS FURTHER ORDERED that this action is dismissed as to all defendants with prejudice.

IT IS SO ORDERED.

Dated this 2nd day of January, 2015.


_____
Robert C. Jones
U.S. District Court Judge


**EXHIBIT 3-9**



**Shari L. Freidenrich, CPA**
Orange County Treasurer - Tax Collector
P.O. BOX 1438 • Santa Ana, CA 92702-1438
625 N. Ross Street, Building 11, Room 658, Santa Ana
Office Hours: 8:00 AM–5:00 PM Monday - Friday
Phone Hours: 9:00 AM–5:00 PM (714) 834-3411
ocgov.com/octaxbill

INTERNET COPY

## 2016–17 SECURED PROPERTY TAX BILL
For Fiscal Year Beginning July 1, 2016 and Ending June 30, 2017

01127.43-0112743 PDFE—    570833 OCT017

ASSESSEE NAME AND ADDRESS ARE NOT AVAILABLE
ONLINE PER CA GOV CODE §6254.21

### DID YOU KNOW?

Don't wait in line, pay online at ocgov.com/octaxbill, receive same day credit and an emailed receipt. There is no cost to pay by eCheck!

Mailed payments must have a USPS postmark on or before the delinquent date. If you wait until the last day to mail your payment, get your envelope hand-stamped with a postmark to ensure it is timely.

Check out the GIS map of your parcel at ocgov.com/octaxmap.

Sign up to receive a due date reminder email at ocgov.com/taxreminder.

**PROPERTY LOCATION**

\*XXXXXXXXG NEWPORT COAST

| ASSESSED VALUES & EXEMPTIONS AS OF JANUARY 1, 2016 | | |
|---|---|---|
| DESCRIPTION | FULL VALUE | COMPUTED TAX |
| LAND | 1,056,649 | |
| IMPROVEMENTS - BUILDING | 534,469 | |
| | | |
| TOTAL VALUES: | 1,591,118 | 19,635.30 |
| HOMEOWNER EXEMPTION | -7,000 | -73.46 |
| TOTAL NET TAXABLE VALUE: | 1,584,118 | 19,561.84 |

**OWNER OF RECORD AS OF 12:01 AM, JANUARY 1, 2016**

ASSESSEE NAME AND ADDRESS ARE NOT AVAILABLE ONLINE PER CA GOV CODE §6254.21

**CORTAC**

| PARCEL NO. (APN) | TAX RATE AREA | 1st Installment DUE 11/1/16 | 2nd Installment DUE 2/1/17 | TO PAY BOTH INSTALLMENTS BY 12/12/16 |
|---|---|---|---|---|
| 935-900-58 | 07-221 | $9,780.92 + | $9,780.92 = | $19,561.84 |

## IMPORTANT INFORMATION

ASSESSEE NAME AND ADDRESS ARE NOT AVAILABLE
ONLINE PER CA GOV CODE §6254.21

| VOTER APPROVED TAXES AND SPECIAL ASSESSMENTS | | | |
|---|---|---|---|
| SERVICE AGENCY | RATE | VALUE | TAXES |
| BASIC LEVY RATE | 1.00000 | 1,584,118 | 15,841.18 |
| COAST COMM COLLEGE DIST | .03116 | 1,584,118 | 493.61 |
| NEWPORT MESA UNIFIED | .01490 | 1,584,118 | 236.03 |
| METRO WATER D-MWDOC | .00350 | 1,584,118 | 55.44 |
| | | | |
| TAX ON LAND ONLY | | | |
| IRWD #240 WATER BOND | .01500 | 1,056,649 | 158.49 |
| IRWD DISTR ID #125 | .01300 | 1,056,649 | 137.37 |
| | | | |
| SPECIAL ASSESSMENT CHARGES | | PHONE NO. | |
| MOSQ.FIRE ANT ASSMT | | (800)273-5167 | 4.02 |
| VECTOR CONTROL CHG | | (800)273-5167 | 0.67 |
| MWD WATER STDBY CHG | | (866)807-6864 | 10.08 |
| 1915 AD BOND MG CNB | | (800)969-4382 | -338.78 |
| 1915 AD BOND M6 | | (949)955-1500 | 2,425.43 |
| NEWPORT-MESA USD CFD 90-1 | | (800)858-8233 | 211.30 |
| OCSD SEWER USER FEE | | (714)593-7281 | 327.00 |
| | | | |
| TOTAL CHARGED | 1.07756 | | 19,561.84 |

FOR DETAILS OF TAX TYPES, VISIT OUR WEBSITE AT OCGOV.COM/OCTAXBILL

THERE WILL BE A $26.00 FEE FOR EACH PAYMENT RETURNED UNPAID BY YOUR BANK FOR ANY REASON

F074-453 (2012)

| FIRST INSTALLMENT DUE 11/1/16 → DELINQUENT AFTER 12/12/16 | $9,780.92 | SECOND INSTALLMENT DUE 2/1/17 → DELINQUENT AFTER 4/10/17 | $9,780.92 | TOTAL DUE AND PAYABLE → | $19,561.84 |
|---|---|---|---|---|---|

## INFORMATION COPY

YOUR MORTGAGE LENDER OR BANK HAS REQUESTED YOUR TAX BILL INFORMATION IN ORDER TO PAY YOUR TAXES. THIS NOTICE IS FOR YOUR PERSONAL RECORDS ONLY. IF YOU NO LONGER HAVE AN IMPOUND ACCOUNT OR IF YOUR BANK SHOULD NOT BE PAYING YOUR TAXES THIS YEAR, YOU MAY USE THIS STATEMENT TO PAY THIS TAX BILL. PAY YOUR TAX BILL ONLINE AT **OCGOV.COM/OCTAXBILL** OR MAIL A CHECK PAYABLE TO COUNTY OF ORANGE. PLEASE WRITE YOUR **PARCEL NUMBER** ON YOUR CHECK.

### NO LONGER HAVE AN IMPOUND ACCOUNT?

YOU ARE RESPONSIBLE FOR PAYING YOUR PROPERTY TAXES, AND WILL NOT BE RECEIVING ANOTHER BILL FOR THIS FISCAL YEAR. YOU CAN VIEW WHETHER THERE ARE ANY PROPERTY TAXES DUE ONLINE AT OCGOV.COM/OCTAXBILL BY INPUTTING YOUR ADDRESS AND VIEWING YOUR CURRENT YEAR PROPERTY TAX BILL. IF YOU NEED TO PAY THE TAXES, YOU CAN EITHER GO ONLINE TO PAY THEM USING AN ECHECK (YOUR BANK ACCOUNT) FOR FREE AT OCGOV.COM/OCTAXBILL OR YOU CAN WRITE A CHECK AND MAIL IT TO:

COUNTY OF ORANGE
ATTN: TREASURER-TAX COLLECTOR
P.O. Box 1438
Santa Ana, CA 92702-1438

**EXHIBIT 4-1**



**Shari L. Freidenrich, CPA**
Orange County Treasurer-Tax Collector
P.O. BOX 1438 • Santa Ana, CA 92702-1438
625 N. Ross St., Bldg. 11, Room G58, Santa Ana
Office Hours: 8:00 AM-5:00 PM Monday - Friday
Phone Hours: 9:00 AM-5:00 PM (714) 834-3411
INTERNET COPY

### DID YOU KNOW?

Pay online at ocgov.com/octaxbill and receive same day credit! Mailed payments must have a USPS postmark on or before the last payment date. If you wait until the last day to mail your payment, get your envelope hand-stamped with a postmark to ensure it is timely.

Got Mello Roos (CFD)? Visit our website at ocgov.com/melloroos for details.

Sign up to receive a reminder email at ocgov.com/taxreminder

## 2015–16 SECURED PROPERTY TAX BILL
For Fiscal Year Beginning July 1, 2015 and Ending June 30, 2016

0071319-0071319 PDFE------ 494691 OCT017
**ASSESSEE NAME AND ADDRESS ARE NOT AVAILABLE
ONLINE PER CA GOV CODE §6254.21**

**PROPERTY LOCATION**

11 SHORE PINE NEWPORT COAST

**ASSESSED VALUES & EXEMPTIONS AS OF JANUARY 1, 2015**

| DESCRIPTION | FULL VALUE | COMPUTED TAX |
|---|---|---|
| LAND | 1,040,777 | |
| IMPROVEMENTS - BUILDING | 526,441 | |
| | | |
| TOTAL VALUES: | 1,567,218 | 19,510.73 |
| HOMEOWNER EXEMPTION | -7,000 | -73.89 |
| TOTAL NET TAXABLE VALUE: | 1,560,218 | 19,436.84 |

**OWNER OF RECORD AS OF 12:01 AM, JANUARY 1, 2015**

ASSESSEE NAME AND ADDRESS ARE NOT AVAILABLE ONLINE PER CA
GOV CODE §6254.21

## CORTAC

| PARCEL NO. (APN) | TAX RATE AREA | 1st Installment DUE 11/1/15 | | 2nd Installment DUE 2/1/16 | | TO PAY BOTH INSTALLMENTS BY 12/10/15 |
|---|---|---|---|---|---|---|
| 935-900-58 | 07-221 | $9,718.42 | + | $9,718.42 | = | $19,436.84 |

### IMPORTANT INFORMATION

ASSESSEE NAME AND ADDRESS ARE NOT AVAILABLE
ONLINE PER CA GOV CODE §6254.21

**VOTER APPROVED TAXES AND SPECIAL ASSESSMENTS**

| SERVICE AGENCY | RATE | VALUE | TAXES |
|---|---|---|---|
| BASIC LEVY RATE | 1.00000 | 1,560,218 | 15,602.18 |
| COAST COMM COLLEGE DIST | .03092 | 1,560,218 | 482.41 |
| NEWPORT MESA UNIFIED | .02125 | 1,560,218 | 331.55 |
| METRO WATER D-MWDOC | .00350 | 1,560,218 | 54.61 |
| | | | |
| TAX ON LAND ONLY | | | |
| IRWD #240 WATER BOND | .01500 | 1,040,777 | 156.11 |
| IRWD DISTR ID #125 | .01300 | 1,040,777 | 135.30 |
| | | | |
| SPECIAL ASSESSMENT CHARGES | | PHONE NO. | |
| MOSQ,FIRE ANT ASSMT | | (800)273-5167 | 3.61 |
| VECTOR CONTROL CHG | | (800)273-5167 | 0.67 |
| MWD WATER STDBY CHG | | (866)807-6864 | 10.08 |
| 1915 AD BOND MG CNB | | (800)969-4382 | -343.28 |
| 1915 AD BOND M6 | | (949)955-1500 | 2,468.56 |
| NEWPORT-MESA USD CFD 90-1 | | (800)858-8233 | 213.04 |
| OCSD SEWER USER FEE | | (714)593-7281 | 322.00 |
| | | | |
| TOTAL CHARGED | 1.08367 | | 19,436.84 |

FOR DETAILS OF TAX TYPES, VISIT OUR WEBSITE AT OCGOV.COM/OCTAXBILL

THERE WILL BE A $26 FEE FOR EACH PAYMENT RETURNED UNPAID BY YOUR BANK FOR ANY REASON.

F074453 (2012)

| FIRST INSTALLMENT DUE 11/1/15 → DELINQUENT AFTER 12/10/15 | $9,718.42 | SECOND INSTALLMENT DUE 2/1/16 → DELINQUENT AFTER 4/11/16 | $9,718.42 | TOTAL DUE AND PAYABLE → | $19,436.84 |
|---|---|---|---|---|---|

### INFORMATION COPY

YOUR MORTGAGE LENDER OR BANK HAS REQUESTED YOUR TAX BILL INFORMATION IN ORDER TO PAY YOUR TAXES. THIS NOTICE IS FOR YOUR PERSONAL RECORDS ONLY. IF YOU NO LONGER HAVE AN IMPOUND ACCOUNT OR IF YOUR BANK SHOULD NOT BE PAYING YOUR TAXES THIS YEAR, YOU MAY USE THIS STATEMENT TO PAY THIS TAX BILL. PAY YOUR TAX BILL ONLINE AT **OCGOV.COM/OCTAXBILL** OR MAIL A CHECK PAYABLE TO COUNTY OF ORANGE. PLEASE WRITE YOUR **PARCEL NUMBER** ON YOUR CHECK.

EXHIBIT 4-2

# MULTNOMAH COUNTY, OREGON
# PROPERTY RECORDS

Property Search Results

**New Search**   **Log Off**

Search Results                        Situs Address: 416 NW 13th

| Property ID | Owner Name | Alternate Account Number | Situs Address | Legal Description |
|---|---|---|---|---|
| P370572 | HASSLER STUDIO INC | P023190608-99 | 416 NW 13TH AVE, RM 608 PORTLAND, OR 97209 | CHOWN PELLA CONDOMINIUMS LOT 608 |
| P626813 | WEST,DIANE H | P023190607-09 | 416 NW 13TH AVE, RM 608 PORTLAND, OR 97209 | CHOWN PELLA CONDOMINIUMS LOT 608 |
| R133550 | DEIBELE,THERESA K | R157000030 | 416 NW 13TH AVE, UN 101 PORTLAND, OR 97209 | CHOWN PELLA CONDOMINIUMS, LOT 101 |
| R133551 | SEAY,DEBORAH M & SEAY,HENRY W G III | R157000060 | 416 NW 13TH AVE, UN 102 PORTLAND, OR 97209 | CHOWN PELLA CONDOMINIUMS, LOT 102 |
| R133552 | CLARK,CHRIS & CLARK,BARBARA | R157000090 | 416 NW 13TH AVE, UN 103 PORTLAND, OR 97209 | CHOWN PELLA CONDOMINIUMS, LOT 103 |
| R133553 | GEHRET,BERNARD G | R157000120 | 416 NW 13TH AVE, UN 104 PORTLAND, OR 97209 | CHOWN PELLA CONDOMINIUMS, LOT 104 |
| R133554 | FAWCETT,RITA W TR & FAWCETT,DANIEL C TR | R157000150 | 416 NW 13TH AVE, UN 105 PORTLAND, OR 97209 | CHOWN PELLA CONDOMINIUMS, LOT 105 |
| R133555 | THOMAS,DEBORAH M | R157000180 | 416 NW 13TH AVE, UN 106 PORTLAND, OR 97209 | CHOWN PELLA CONDOMINIUMS, LOT 106, DEFERRED ADDITIONAL TAX LIABILITY |
| P370568 | VACANT | P023190000-99 | 416 NW 13TH AVE, UN 107 PORTLAND, OR 97209 | CHOWN PELLA CONDOS LOT 107 |
| P370569 | LE FEVER,FRANCES | P023190000-98 | 416 NW 13TH AVE, UN 107 PORTLAND, OR 97209 | CHOWN PELLA CONDOMINIUMS |

**Click on the "Property ID" for more Information about that Property or use the controls below to select a page.**

EXHIBIT 4-3



# MULTNOMAH COUNTY, OREGON
# PROPERTY RECORDS

Property Information

| Property Information | Tax Summary | Assessment History | Improvement Information | New Search | Search Results | Printable Summary | Logoff |

**Search Results for P370569**　　　　　　　**Pay Now**

**Owner Name**

LE FEVER, FRANCES
DBA: LE FEVER & ASSOCIATES

**Property ID Number**

P370569

**Owner Address**

416 NW 13TH AVE #107
PORTLAND, OR 97209

**Situs Address**

416 NW 13TH AVE, UN 107
PORTLAND, OR 97209

**Alternate Account Number**

P023190000-98

**Neighborhood**

**Map Tax Lot**

1N1E33DA -70032

**Levy Code Area - Taxing Districts**

708 - RIVER DISTRICT UR - PPSD & PCC

**Portland Maps**

Click to Open Map

**Information on Ordering Copies**

Click to Open Order Form

## Property Description

**Exemption**

**Expiration Date**

**Tax Roll Description**

CHOWN PELLA CONDOMINIUMS

**Map Number**

1N1E33DA -70032

**Parcel**

**Account Status**

D - Deleted Property

**Property Use**

SERVICE - MISC.

**Year Built**

**Acreage**

**Related Accounts**

P370568, P370571, P370573, P544214, P653992, P658281, R133556

**Linked Accounts**

**Split/Merge Account**

**Split/Merge Account Message**

**Special Account Information**

## Sales Information

| Deed | Grantor (Seller) | Grantee (Buyer) | Instrument | Date | Consideration Amount |
|------|------------------|-----------------|------------|------|----------------------|

## 2016 Land Information (Unedited and Uncertified)

| ID | Type | | Acres | Sq Ft |
|----|------|--|-------|-------|

INFORMATION SUBJECT TO DISCLAIMER - SEE HOME PAGE　　　　EXHIBIT 4-4

Case 16-03114-pcm　　Doc 23　　Filed 11/15/16

FILED

PETER SZANTO 949-887-2369
P. O. BOX 14894
Irvine CA 92623



2015 FEB 11  PM 1:21

CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIF.
SANTA ANA

BY:_____

# United States District Court
### Central District of California – Santa Ana

Peter Szanto, plaintiff

    V.

a) Persolve, LLC (individually and

    DBA Account Resolution Associates),

b) Account Resolution Associates,

c) Victor Alexander Szanto,

d) Anthony Szanto (aka Tony Szanto),

e) Internal Revenue Service,

           defendants


**\*\* JURY is REQUESTED \*\***

Case No.: SACV15:00241 AG (DFMX)

# COMPLAINT
# for DAMAGES

## based on:

1) Fraud (knowing false and
fraudulent creation of internal
revenue debt by defendants
attributable to plaintiff)

2) Fraudulent Transfer

3) Identity Theft

4) Intentional Infliction of
    Emotional Distress


**Jurisdiction based on
28 U.S.C.A. § 1340 exclusive
Federal jurisdiction over
internal revenue**

Complaint - page 1

EXHIBIT 5-1

1. This matter is before this Court upon the basis of 28 USC § 1340 which states:

   "The district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue"

2. On, or about, 12-19-2014, plaintiff received from the Internal Revenue Service (IRS) [EXHIBIT A] regarding Income Tax Examination Changes.

3. The greatest proportion of said IRS changes is comprised of cancellation of debt income in the amount of $292,868.00

4. The fundamental basis of the Internal Revenue Service's claim against plaintiff is that: a) plaintiff obtained money, b) plaintiff did not repay that money, c) the entities who provided money to plaintiff thereafter wrote-off plaintiff's indebtedness, d) now the Internal Revenue Service contends that plaintiff must pay income tax on that amount of debt which was cancelled.

5. Plaintiff's reaction to all these allegations has been utter shock, dismay and confusion.

6. After receiving the tax change notice, plaintiff has been emotionally and physically incapacitated.

7. Plaintiff required and obtained medical treatment for the physical pain and emotional anguished engendered by the Internal Revenue Service notice.

Complaint - page 2

Exhibit 5-2

8.  Plaintiff is unaware of any debt which, throughout his life, he has ever failed to repay, or which he is currently servicing to repay.

9.  And, if any person / entity has any valid claim against plaintiff, plaintiff is available to discuss any such claim -- immediately!!

10.  Since having received notice of this potential tax liability incident, plaintiff has taken steps to effect diligent inquiry of the facts and of the nature of the allegations against him.

11.  Plaintiff's investigations and examinations have determined that most likely the persons and events which caused him to be accused of failing to repay debts which were later written-off occurred most probably through the actions of plaintiff's natural brothers Victor Alexander Szanto and Anthony Szanto – who are are both over 21 years of age and named as defendants herein.

12.  Two other defendants potentially liable for the indebtedness attributed to plaintiff are two business entities: Persolve, LLC (individually and DBA Account Resolution Associates). (The form of business structure of these entities is presently unknown.)

13.  These business entities variously interchange their names and identities, and it is unclear of the relationship between the two.

14.  Plaintiff thereon contends that the defendants: Victor Szanto, Anthony Szanto, Persolve and /or Account Resolution Associates -- individually, jointly or in concert with one another

Complaint - page 3

EXHIBIT 5-3

intentionally used, misappropriated and / or otherwise employed

plaintiff's identity (name, social security number, driver's license

and / or other identifying information) so as to create borrowings

and debt seemingly attributable to plaintiff – but from which

defendants falsely obtained moneys in plaintiff's name.

15.  Plaintiff contends that thereafter Victor Szanto, Anthony Szanto,

Persolve and /or Account Resolution Associates failed to repay

said debts and borrowings, thereby creating upon the books

and accounts of the creditors liabilities / debts in the name of

plaintiff.

16.  After investigation, Peter Szanto contends that the amount

upon which the Internal Revenue Service seeks payment

represents various bank accounts / credit accounts, opened by

others, in Peter Szanto's name.

17.  In that regard, Peter Szanto contends that persons and or

entities who would be motivated to – and who would have the

capacity, opportunity and motive -- to steal Peter Szanto's

identity are Persolve and / or Victor Alexander Szanto and / or

Anthony Szanto.

18.  Victor Szanto and Anthony Szanto are Peter Szanto's natural

brothers who have demonstrated knowledge, motivation,

larcenous intent and capacity regarding the acquisition of money,

assets and property, without permission, belonging to Peter

Szanto.

Complaint – page 4

EXHIBIT 5-4

19. Thereon, Peter Szanto makes the following claims based on the fact that the Internal Revenue Service's claim attests to, and evidences, theft of Peter Szanto's identity --- and therefore, some party or parties must be responsible for that identity theft.

20. Plaintiff's contention regarding the Internal Revenue Service is that the IRS knowingly facilitated thefts of Peter Szanto's identity by the other defendants by knowingly failing to take steps to stop said identity theft – by assessing liability to Peter Szanto with any proper investigative process.

21. Upon these facts, and further facts to be incorporated as they become know, plaintiff asserts the following causes of action.

22. Plaintiff retains all right to amend this claim as to both parties and additional causes of action.

## First Cause of Action for Identity Theft

23. False impersonation of another for fraudulent and improper purposes is not a new phenomenon.

24. One origin of these despicable acts is recorded (approximately 2300 BCE) in the Torah (ie, the first five books of the Bible (wherein Jacob impersonates Essau to receive Issac's blessing, birthright and inheritance: *Genesis* 27:34-40).

25. The current law is codified in California Penal Code, § 529 (originally enacted in 1872).

Complaint - page 5

EXHIBIT 5-5

26. The advent of the Information Age and computerized databases have helped make identity theft and related fraudulent behaviors among the fastest growing forms of white collar crimes. (*California Banker*, Vol. XV, No. 4, p. 9 (1998).)

27. The USA's three largest credit reporting agencies, Experian, TransUnion, and Equifax, reported an increase in identity fraud complaints from 12,000 in 1992 to 500,000 in 1998, and the U.S. Social Security Administration received more than 30,000 complaints in 1999 regarding misuse of Social Security numbers, most involving identity theft, up from 7,868 in 1997. (*New York Times*, Apr. 3, 2000, p. B-1.)

28. The numbers for 2003 increased well beyond these levels.

29. In 1998 the U.S. Congress, following the lead of Arizona and California, promulgated a federal crime of identity theft and required the Federal Trade Commission to establish an identity theft database and consumer clearinghouse.

30. The laws upon which the instant civil claims made herein are "The Identity Theft and Assumption Deterrence Act of 1998," 18 U.S.C. § 1028:

"(a) Whoever, in a circumstance described in subsection (c) of this section--

(1) knowingly and without lawful authority produces an identification document, authentication feature, or a false identification document;

(2) knowingly transfers an identification document, authentication feature, or a false identification document knowing that such document or feature was stolen or produced without lawful authority;

EXHIBIT 5-6

(3) knowingly possesses with intent to use unlawfully or transfer unlawfully five or more identification documents (other than those issued lawfully for the use of the possessor), authentication features, or false identification documents;

(4) knowingly possesses an identification document (other than one issued lawfully for the use of the possessor), authentication feature, or a false identification document, with the intent such document or feature be used to defraud the United States;

(5) knowingly produces, transfers, or possesses a document-making implement or authentication feature with the intent such document-making implement or authentication feature will be used in the production of a false identification document or another document-making implement or authentication feature which will be so used;

(6) knowingly possesses an identification document or authentication feature that is or appears to be an identification document or authentication feature of the United States or a sponsoring entity of an event designated as a special event of national significance which is stolen or produced without lawful authority knowing that such document or feature was stolen or produced without such authority;

(7) knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law; or

(8) knowingly traffics in false or actual authentication features for use in false identification documents, document-making implements, or means of identification;

shall be punished as provided in subsection (b) of this section.

(b) The punishment for an offense under subsection (a) of this section is—

(1) except as provided in paragraphs (3) and (4), a fine under this title or imprisonment for not more than 15 years, or both, if the offense is—

EXHIBIT 5-7

(A) the production or transfer of an identification document, authentication feature, or false identification document that is or appears to be--

(i) an identification document or authentication feature issued by or under the authority of the United States; or

(ii) a birth certificate, or a driver's license or personal identification card;

(B) the production or transfer of more than five identification documents, authentication features, or false identification documents;

(C) an offense under paragraph (5) of such subsection; or

(D) an offense under paragraph (7) of such subsection that involves the transfer, possession, or use of 1 or more means of identification if, as a result of the offense, any individual committing the offense obtains anything of value aggregating $1,000 or more during any 1-year period;

(2) except as provided in paragraphs (3) and (4), a fine under this title or imprisonment for not more than 5 years, or both, if the offense is--

(A) any other production, transfer, or use of a means of identification, an identification document,, authentication feature, or a false identification document; or

(B) an offense under paragraph (3) or (7) of such subsection;

(3) a fine under this title or imprisonment for not more than 20 years, or both, if the offense is committed--

(A) to facilitate a drug trafficking crime (as defined in section 929(a)(2));

(B) in connection with a crime of violence (as defined in section 924(c)(3)); or

(C) after a prior conviction under this section becomes final;

(4) a fine under this title or imprisonment for not more than 30 years, or both, if the offense is committed to facilitate an act of domestic terrorism (as defined under section 2331(5) of this title) or an act of international terrorism (as defined in section 2331(1) of this title);

EXHIBIT 5-8

(5) in the case of any offense under subsection (a), forfeiture to the United States of any personal property used or intended to be used to commit the offense; and

(6) a fine under this title or imprisonment for not more than one year, or both, in any other case.

(c) The circumstance referred to in subsection (a) of this section is that--

(1) the identification document, authentication feature, or false identification document is or appears to be issued by or under the authority of the United States or a sponsoring entity of an event designated as a special event of national significance or the document-making implement is designed or suited for making such an identification document, authentication feature, or false identification document;

(2) the offense is an offense under subsection (a) (4) of this section; or

(3) either--

(A) the production, transfer, possession, or use prohibited by this section is in or affects interstate or foreign commerce, including the transfer of a document by electronic means; or

(B) the means of identification, identification document, false identification document, or document-making implement is transported in the mail in the course of the production, transfer, possession, or use prohibited by this section.

(d) In this section and section 1028A--

(1) the term "authentication feature" means any hologram, watermark, certification, symbol, code, image, sequence of numbers or letters, or other feature that either individually or in combination with another feature is used by the issuing authority on an identification document, document-making implement, or means of identification to determine if the document is counterfeit, altered, or otherwise falsified;

(2) the term "document-making implement" means any implement, impression, template, computer file, computer disc, electronic device, or computer hardware or software, that is specifically configured or

Complaint - page 9

EXHIBIT 5-9

primarily used for making an identification document, a false identification document, or another document-making implement;

(3) the term "identification document" means a document made or issued by or under the authority of the United States Government, a State, political subdivision of a State, a sponsoring entity of an event designated as a special event of national significance, a foreign government, political subdivision of a foreign government, an international governmental or an international quasi-governmental organization which, when completed with information concerning a particular individual, is of a type intended or commonly accepted for the purpose of identification of individuals;

(4) the term "false identification document" means a document of a type intended or commonly accepted for the purposes of identification of individuals that--

(A) is not issued by or under the authority of a governmental entity or was issued under the authority of a governmental entity but was subsequently altered for purposes of deceit; and

(B) appears to be issued by or under the authority of the United States Government, a State, a political subdivision of a State, a sponsoring entity of an event designated by the President as a special event of national significance, a foreign government, a political subdivision of a foreign government, or an international governmental or quasi-governmental organization;

(5) the term "false authentication feature" means an authentication feature that--

(A) is genuine in origin, but, without the authorization of the issuing authority, has been tampered with or altered for purposes of deceit;

(B) is genuine, but has been distributed, or is intended for distribution, without the authorization of the issuing authority and not in connection with a lawfully made identification document, document-making implement, or means of identification to which such authentication feature is intended to be affixed or embedded by the respective issuing authority; or

(C) appears to be genuine, but is not;

Complaint - page 10

EXHIBIT 5-10

(6) the term "issuing authority"--

(A) means any governmental entity or agency that is authorized to issue identification documents, means of identification, or authentication features; and

(B) includes the United States Government, a State, a political subdivision of a State, a sponsoring entity of an event designated by the President as a special event of national significance, a foreign government, a political subdivision of a foreign government, or an international government or quasi-governmental organization;

(7) the term "means of identification" means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any--

(A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;

(B) unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation;

(C) unique electronic identification number, address, or routing code; or

(D) telecommunication identifying information or access device (as defined in section 1029(e));

(8) the term "personal identification card" means an identification document issued by a State or local government solely for the purpose of identification;

(9) the term "produce" includes alter, authenticate, or assemble;

(10) the term "transfer" includes selecting an identification document, false identification document, or document-making implement and placing or directing the placement of such identification document, false identification document, or document-making implement on an online location where it is available to others;

Complaint - page 11

**EXHIBIT 5-11**

(11) the term "State" includes any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any other commonwealth, possession, or territory of the United States; and

(12) the term "traffic" means--

(A) to transport, transfer, or otherwise dispose of, to another, as consideration for anything of value; or

(B) to make or obtain control of with intent to so transport, transfer, or otherwise dispose of.

(e) This section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a State, or a political subdivision of a State, or of an intelligence agency of the United States, or any activity authorized under chapter 224 of this title.

(f) Attempt and conspiracy.--Any person who attempts or conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

(g) Forfeiture procedures.--The forfeiture of property under this section, including any seizure and disposition of the property and any related judicial or administrative proceeding, shall be governed by the provisions of section 413 (other than subsection (d) of that section) of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853).

(h) Forfeiture; disposition.--In the circumstance in which any person is convicted of a violation of subsection (a), the court shall order, in addition to the penalty prescribed, the forfeiture and destruction or other disposition of all illicit authentication features, identification documents, document-making implements, or means of identification.

(i) Rule of construction.--For purpose of subsection (a)(7), a single identification document or false identification document that contains 1 or more means of identification shall be construed to be 1 means of identification."

Complaint - page 12

EXHIBIT 5-12

31. The availability of civil penalties under these laws for identity theft has been repeatedly affirmed: *Satey v. JPMorgan Chase & Co.* (9th CA 2008) 521 F.3rd 1087, *U.S. v. Maciel-Alcala* (9th CA 2010) 612 F.3rd 1092, *Coto Settlement v. Eisenberg* (9th CA 2010) 593 F.3rd 1031.

32. The elements necessary to prove and maintain this civil cause of action for identity theft are:

    a) improper use of plaintiff's identity without permission. Here plaintiff contends that defendants used plaintiff's identity to obtain money by opening bank accounts in Peter Szanto's name which became debt and subsequent tax liability against Peter Szanto.

    b) proximate cause of financial injury or harm to plaintiff. Here, Peter Szanto's financial life has been ruined by the fact that defendants have stolen his identity and obtained money using plaintiff's name and identity. Likewise, plaintiff is still liable for taxes on debt cancellation of these bank and credit accounts.

        i. proof of injury to reputation shall also be sufficient to maintain a civil action for restitution for identity theft. Peter Szanto will demonstrate such injury to his reputation by proof (eg, diminished FICO score, etc.)

Complaint - page 13

EXHIBIT 5-13

33. In this action, Peter Szanto will demonstrate by proof that persons and / or entities responsible for theft of his identity were Persolve, Account Resolution Associates and / or Victor Szanto and / or Anthony Szanto.

34. Peter Szanto will demonstrate, by proof of all facts alleged, that he has been harmed and injured in an amount greater than $100,000 by way of the defendants' actions, because plaintiff's identity was used and employed to create indebtedness and tax liability which plaintiff must now seek to have abated.

### Second Cause of Action for Fraud

37 . The elements to maintain a cause of action for fraud are
   a) misrepresentation, ie, false representation, concealment or non-disclosure.
   b) knowledge of said falseness or scienter
   c) intent to defraud – ie intent to induce reliance
   d) justifiable reliance
   e) resulting damages.

35. In this case, the fraud by which Peter Szanto has been damaged is that the defendants (singly or jointly) intentionally perpetrating their improper use of plaintiff's name and identity.

36. At all times defendants knew that their use of plaintiff's identity

Complaint - page 14

EXHIBIT 5-14

without plaintiff's permission or knowledge was a knowing false, improper / and mis- representation of plaintiff.

37. Defendants despicable intent was at all times to defraud lenders into believing that borrowings in the name of Peter Szanto were actually undertaken by Peter Szanto.

38. Defendants did induce lenders and did defraud lenders by pretending that they – the defendants jointly or singly – were Peter Szanto.

39. There was justifiable reliance on defendants' representations by financial institutions because defendants were able to present sufficient identifying material so as to be successfully believed to be plaintiff –even though those impersonations were knowingly false.

40. Plaintiff was injured by the defendants fraud, because he now faces tax liability on the amount of <u>**$292,868.**</u><u>**00**</u> which moneys were never received by – nor ever in – his possession.


### <u>Third Cause of Action for Fraudulent Transfer</u>

41. California Civil Code § 3439 explains the elements of law and facts necessary to maintain and prove-up the facts of a cause of action based on fraudulent transfer.

42. A claim upon fraudulent transfer exists when a transfer of property has been made or an obligation has been incurred with

EXHIBIT 5-15

intent to defraud the lawful owner of property, and / or of any
expectancy of property.

43. A claim upon fraudulent transfer also arises when the owner of
property is induced to transfer property without receiving
reasonable or truthful equivalent value in exchange therefore.

44. Here, plaintiff contends that at all times, herein, defendants
sole purpose and intent was fraudulently to transfer assets
obtained in Peter Szanto's name into their own accounts.

45. Plaintiff alleges, upon the facts related herein, and additional
facts which may be discovered and proved, that all transfers
made, property owned and / or obligations incurred by the
defendants regarding moneys obtained by the use of Peter
Szanto's name and identity were fraudulent because these
activities were made and / or undertaken:

(a) With actual intent to hinder, delay or defraud plaintiff'
learning of the theft of his identity.

(b) Transfers by defendants were made and undertaken
without plaintiff receiving a reasonably equivalent
amount of value regarding money obtained in plaintiff's
name.

46. Here all of the following factors which prove-up the elements of
a cause of action for fraudulent transfers were present:

Complaint - page 16

EXHIBIT 5-16

a) The transfers to defendants were intentionally made by insiders Victor and Anthony Szanto with the intent to defraud Peter Szanto and to deprive Peter Szanto of assets to which he was rightfully entitled (ie, money obtained using Peter Szanto's name, identity and credit worthiness).

b) At all times the defendants retained control of all property transferred. Persolve, Account Resolution Associates, Victor Szanto and / or Anthony Szanto currently have complete and unfettered use and enjoyment of all those assets.

c) All transfers were concealed from Peter Szanto.

47. Upon the law and facts presented, plaintiff alleges that defendants currently hold, posses and profit from the fraudulently acquired assets, accretions to assets and their daily operation for profit from the assets which were fraudulently transferred to the defendants.

48. Plaintiff thereon asks for relief based on the intentional fraudulent transfers described above by which he was deprived of property that is his -- **to the extent that said moneys were acquired by use of plaintiff's name and identity**.

49. Relief is requested either as restitution of fraudulently transferred money or separate payment thereof in an amount of approximately **$292,868.$^{00}$**.

Complaint - page 17

EXHIBIT 5-17

## Fourth Cause of Action for Intentional Infliction of Emotional Distress

50.  The elements necessary to prove the tort of intentional infliction of emotional distress are:

    i.  extreme and outrageous conduct by the defendants with the intention of causing, or reckless disregard of the probability of causing, emotional distress. Here, the defendants actions in stealing plaintiff's identity so as to purloin at least **$292,868.**$^{00}$ can readily be understood to cause emotional suffering to a person who learns of such behavior for the first time by receiving a tax bill from the Internal Revenue Service!

    ii.  plaintiff has suffered, and continues to suffer, severe and extreme emotional distress since learning of the theft of his identity.

    iii.  the actual and proximate causation of plaintiff's emotional distress was the defendants' outrageous conduct of theft of Peter Szanto's identity

    iv.  defendants theft of plaintiff's identity caused injury, harm and damage to plaintiff in an amount to be shown by proof.

//

Complaint - page 18

EXHIBIT 5-18

51.  Thereon, Peter Szanto seeks relief in an amount to be shown by proof, but already known to be greater than **$292,868.**[00]  for medical bills and general damages suffered from emotional distress and psychic injury caused by defendants' conduct .

52.  Plaintiff further requests costs of this action and such other and further relief as this Court may deem appropriate.

## CLAIMS AS TO ADDITIONAL DOE DEFENDANTS

53.  All of the claims made herein are reiterated as to Doe defendants who are not presently known, but who may be discovered and joined into this action as further facts are revealed.

DATED 9 February 2015 _____ Peter Szanto

Complaint - page 19

EXHIBIT 5-19

| Form **4549-A** (Rev. March 2013) | Department of the Treasury-Internal Revenue Service **Income Tax Examination Changes** **(Unagreed and Excepted Agreed)** | | Page   1   of   2 |
|---|---|---|---|
| Name and Address of Taxpayer PETER & SUSAN SZANTO 11 SHORE PINE DR NEWPORT COAST  CA   92657-1544 | | Taxpayer Identification Number ▓▓▓▓▓▓▓ | Return Form No.: 1040 |
| | | Person with whom examination changes were discussed: | Name and Title: |

| 1. Adjustments to Income | | 12/31/2010 | Period End | Period End |
|---|---|---|---|---|
| a. Cancellation of Debt Income | | 292,868.00 | | |
| b. Substitute Payments Income | | 1,093.00 | | |
| c. Itemized Deductions | | 1,588.00 | | |
| d. Exemptions | | 7,300.00 | | |
| e. | | | | |
| f. | | | | |
| g. | | | | |
| h. | | | | |
| i. | | | | |
| j. | | | | |
| k. | | | | |
| l. | | | | |
| m. | | | | |
| n. | | | | |
| o. | | | | |
| p. | | | | |
| 2. Total Adjustments | | 302,849.00 | | |
| 3. Taxable Income Per Return or as Previously Adjusted | | (17,111.00) | | |
| 4. Corrected Taxable Income | | 285,738.00 | | |
|    Tax Method | | SCHEDULE D | | |
|    Filing Status | | Joint | | |
| 5. Tax | | 65,811.00 | | |
| 6. Additional Taxes / Alternative Minimum | | 5,905.00 | | |
| 7. Corrected Tax Liability | | 71,716.00 | | |
| 8. Less     a. | | | | |
|    Credits  b. | | | | |
|            c. | | | | |
|            d. | | | | |
| 9. Balance (Line 7 less total of Lines 8a thru 8d) | | 71,716.00 | | |
| 10. Plus    a. | | | | |
|    Other   b. | | | | |
|    Taxes   c. | | | | |
|            d. | | | | |
| 11. Total Corrected Tax Liability (Line 9 plus Lines 10a thru 10d) | | 71,716.00 | | |
| 12. Total Tax Shown on Return or as Previously Adjusted | | 0.00 | | |
| 13. Adjustments to: a. See Attached | | (800.00) | | |
|                    b. | | | | |
|                    c. | | | | |
| 14. Deficiency-Increase in Tax or (Overassessment - Decrease in Tax) (Line 11 less Line 12 adjusted by Lines 13a through 13c) | | 72,516.00 | | |
| 15. Adjustments to Prepayment Credits-Increase (Decrease) | | | | |
| 16. Balance Due or (Overpayment) - (Line 14 adjusted by Line 15) (Excluding interest and penalties) | | 72,516.00 | | |

Catalog Number 23110T                                www.irs.gov

EXHIBIT 5-20

| Form **4549-A** (Rev. March 2013) | Department of the Treasury-Internal Revenue Service **Income Tax Examination Changes** (Unagreed and Excepted Agreed) | | Page __2__ of __2__ |

| Name of Taxpayer PETER & SUSAN SZANTO | Taxpayer Identification Number | Return Form No. 1040 |

| 17. Penalties/ Code Sections | Period End 12/31/2010 | Period End | Period End |
|---|---|---|---|
| a. Delq- IRC 6651 (a) (1) | 17,502.76 | | |
| b. Accuracy- IRC 6662 | 14,503.20 | | |
| c. | | | |
| d. | | | |
| e. | | | |
| f. | | | |
| g. | | | |
| h. | | | |
| i. | | | |
| j. | | | |
| k. | | | |
| l. | | | |
| m. | | | |
| n. | | | |
| 18. **Total Penalties** | 32,005.96 | | |

| Underpayment attributable to negligence: (1981-1987) A tax addition of 50 percent of the interest due on the underpayment will accrue until it is paid or assessed. | | | |
|---|---|---|---|
| Underpayment attributable to fraud: (1981-1987) A tax addition of 50 percent of the interest due on the underpayment will accrue until it is paid or assessed. | | | |
| Underpayment attributable to Tax Motivated Transactions (TMT). Interest will accrue and be assessed at 120% of underpayment rate in accordance with IRC 6621(c). | 0.00 | | |

| 19. Summary of Taxes, Penalties and Interest: | | | |
|---|---|---|---|
| a. Balance due or (Overpayment) Taxes – (Line 16, Page 1) | 72,516.00 | | |
| b. Penalties (Line 18) - computed to 12/09/2014 | 32,005.96 | | |
| c. Interest (IRC § 6601) - computed to 01/08/2015 | 12,229.61 | | |
| d. TMT Interest - computed to 01/08/2015 (on TMT underpayment) | 0.00 | | |
| e. Amount due or refund - (sum of Lines a, b, c and d) | 116,751.57 | | |

**Other Information:**

IRC 6404(g) does not apply.

| Examiner's Signature: Name John Reed | Employee ID: 0246270 | Office: | Date: 12/09/2014 |

The Internal Revenue Service has agreements with state tax agencies under which information about federal tax, including increases or decreases, is exchanged with the states. If this change affects the amount of your state income tax, you should amend your state return by filing the necessary forms.

You may be subject to backup withholding if you underreport your interest, dividend, or patronage dividend income you earned and do not pay the required tax. The IRS may order backup withholding (withholding of a percentage of your dividend and/or interest payments) if the tax remains unpaid after it has been assessed and four notices have been issued to you over a 120-day period.

| Catalog Number 23110T | www.irs.gov | Form **4549-A** (Rev. 3-2013) |

**EXHIBIT 5-21**