PETER SZANTO 503-610-0865
P.O. Box 4614
Portland OR 97208

US BANKRUPTCY COURT
DISTRICT OF OREGON

2016 DEC -6 AM 9: 07

LODGED___ REC'D___

# United States Bankruptcy Court

## in and for the District of OREGON

1001 SW 5th Av., Portland OR 97204

| | |
|---|---|
| In Re Peter Szanto, Debtor | **Adversarial # 16-ap-3114** |
| ====================== | |
| Peter Szanto, Plaintiff | **core case:16–bk-33185-pcm11** |
| **vs.** | |
| Evye Szanto, et al, | **First Amended Complaint** |
| Defendants | |

1. Comes now Peter Szanto, who within the time allowed by law – specifically, FRBP 7015 and FRCP 15(a)(1)(B), hereby and herewith amends his originally filed complaint **as a matter of right** within 21 days after the filing of defendants' **NEVER-SERVED** – and thus ineffective - Motion to Dismiss (Docket Entry # 23, filed 11/15/16)[1] :

   _____

   *1. Instant amended complaint's filing waives no rights regarding defendants' failure, timely to serve, their responsive pleading.*

"(a) Amendments Before Trial.

    (1) *Amending as a Matter of Course.* A party may amend its pleading once as a matter of course within:

    . . . . (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."

## 1. BASIS of DEBTOR'S CLAIMS

1. Comes now debtor Peter Szanto who pleads these truthful, plausible and actual events, facts and law.

2. This is an action under U.S. Bankruptcy law to recover money and property belonging to the debtor Peter Szanto's Bankruptcy estate.

3. This is an action to recover money and property which the defendants acquired, in concert or acting individually, through theft
-- and subsequent improper use – of plaintiff's identity and personal / private identifying information. (IE, conversion of identity, etc.)

4. This is an action to recover money and property belonging to debtor which defendants acquired through conversion of debtor Peter Szanto's money as well as debtor's real and personal property.

16-ap-3114         First Amended Complaint – pg. 2

5. This is an action which asks this Court to reassign tax liability – which was generated through defendants' improper use of plaintiff's identity which created tax liability for debtor / plaintiff.

6. This is also an action to recover money and property absconded though fraud committed by the defendants against the plaintiff.

7. This is an action under 18 USC § 1961 (RICO LAW) regarding the despicable **racketeering activities** of defendants whereby debtor / plaintiff was harmed and injured.

8. This is also an action based upon the abject conspiracy of the defendants working in concert with one another to commit the improper acts as described herein.

9. This is an action for such further and other relief as may be proven OR sound in equity OR which this Court deigns fit to grant based upon its equitable powers, or any other just cause.

## 2. JURISDICTION

10. Jurisdiction is based on United States Code Title 11, the Bankruptcy Court's inherent jurisdiction --- to recover Peter Szanto's Bankruptcy estate's assets which were converted and used by the defendants.

11. Jurisdiction is also based on exclusive Federal jurisdiction to reassign internal revenue liability.

12. Jurisdiction is also based on exclusive Federal jurisdiction over civil claims for harm sought under the RICO laws.

## 3. FACTS

13. The fundamental claim herein relates, derives and arises from money acquired by Peter Szanto in his **individual capacity** while a minor (on or about 1-1-1966 when Plaintiff was 15 years old).

14. After said acquisition Peter Szanto's parents (Klara Szanto and Paul Szanto), took charge of said money as either: a) a trust for the benefit of Peter Szanto, b) as a bailment for the benefit of Peter Szanto, c) as a guardianship for the benefit of Peter Szanto, d) as a prospective right to real and personal property fully vested in Peter Szanto, e) a representative conservatorship on behalf of a minor, f) some other form of joint adult supervision of the money and property of a minor.

15. Thereafter, as will be related more fully momentarily, some, or all, of the defendants overpowered the freewill, the logical thinking and the rational ability to understand the consequences of their actions of Klara Szanto and Paul Szanto.

16. The defendants were then able to use and expropriate money, property, real estate, etc. -- which belongs to Peter Szanto--as their own private BANK / personal treasure trove to finance their lavish, opulent, brutally-egocentric and depraved lifestyles.

17. This action seeks restitution of **ALL** money and property (and accretions thereon) which has belonged to Peter Szanto since his personal / individual acquisition thereof on 1-1-1966.

18. In further despicable efforts to frustrate the lawful and rightful restitution of Peter Szanto's money and property to Peter Szanto, the defendants contrived to create whatever financial, legal and psychological impediments they could against Peter Szanto.

19. Defendants also did this by undertaking the use of Peter Szanto's name and identity to create bank loan and credit card accounts which defendants personally used, depleted and never repaid.

20. The various bank and credit card companies were unable to obtain repayment of monies borrowed defendants.

21. The various bank and credit card companies thereafter declared said un-repaid monies to be bad debts and obtained tax credits as to those un-repaid monies.

22. The tax credits to the banks and credit card companies were then categorized, by the Internal Revenue Service, as imputed income to Peter Szanto on which Peter Szanto has been assessed income tax, and payment of tax has been processed.

### a. *Money and Property Acquired by Peter Szanto*

23. Some time in 1965 Peter Szanto prevailed in an action based on false imprisonment, negligence in custodial housing and other torts against various San Francisco City and County agencies and the manufacturer of a defective fire extinguisher.

16-ap-3114                    First Amended Complaint – pg. 5

24. Peter Szanto was awarded $250,000.$^{00}$ as compensation for Peter Szanto's various tort damage and personal injury claims.

25. Klara Szanto, Paul Szanto and defendants made no recovery from that action – or any other action arising from the facts stated in ¶ 23.

26. Because Peter Szanto was a minor, the $250,000 was given to his parents Paul and Klara Szanto as either: a) a trust for the benefit of Peter Szanto, b) as a bailment for the benefit of Peter Szanto, c) as a guardianship for the benefit of Peter Szanto, d) as a prospective right to real and personal property fully vested in Peter Szanto, e) a representative conservatorship on behalf of a minor, f) some other form of joint adult supervision of the money and property of a minor.

27. Irrespective of the form of the form of acquisition, by the receipt of said money, Paul and Klara Szanto became Peter Szanto's fiduciaries as to that $250,000.$^{00}$ on, or about,1-1-1966.

28. Some time in, or about, September 1966, Paul and Klara Szanto used a portion of said $250,000 to purchase the real property which is commonly known as: 105 Baywood Avenue, Hillsborough, San Mateo County, California San Mateo Assessor's Parcel Number 032422130. The legal description of which is:

    0.841 ACRE / MOL HAVING 39 FT FRONTAGE ON
    BAYWOOD AVENUE + 201.94 FT FRONTAGE ON
    CRYSTAL SPRINGS ROAD.

16-ap-3114                              First Amended Complaint – pg. 6

29.  Peter Szanto contends that at all times (while their minds and
     conduct remained rational lucid and coherent) Klara Szanto and
     Paul Szanto's goals, motivations and intentions, and absolute
     desires, were to convey said real property to its rightful owner,
     debtor herein, Peter Szanto.

30.  However, as the history of this matter demonstrates the defendants
     overcame the free-will and actual intent of Klara Szanto and Paul
     Szanto so as to pretend and falsify that title to the Baywood
     Avenue property (and other real properties, the purchases of
     which were financed with accretions from the Baywood Property)
     resided in a trust which defendants were able to manipulate for
     their own improper personal gain and sole use.

### b. Relevant Szanto Family History

31.  Klara Szanto, Paul Szanto and Peter Szanto arrived in the U.S. as
     refugees in 1957.

32.  In the interim from 1957 until the end of 1965, Paul Szanto and
     Klara Szanto (neither of whom had any professional training nor
     college education) operated a photo shop in San Francisco CA
     which provided them a barely subsistence income.

33.  Between 1957 and 1965 Paul Szanto and Klara Szanto had three
     additional children, Barbara Szanto Alexander, Victor Szanto and
     Anthony Szanto, defendants herein.

34. Paul Szanto and Klara Szanto's income was woefully inadequate to support themselves let alone four children.

35. The Szanto family moved from ever cheaper apartment to apartment – dodging bills, evictions and landlords in an effort – just to survive.

36. In 1965, Peter Szanto was arrested and incarcerated until trial.

37. After being exonerated Peter Szanto was awarded $250,000 upon various tort, personal injury and negligent custodial supervision claims.

38. Because Peter Szanto was a minor, the $250,000 was given to his parents, Klara Szanto and Paul Szanto, as either: a) a trust for the benefit of Peter Szanto, b) as a bailment for the benefit of Peter Szanto, c) as a guardianship for the benefit of Peter Szanto, d) as a prospective right to real and personal property fully vested in Peter Szanto, e) a representative conservatorship on behalf of a minor, f) some other form of joint adult supervision of the money and property of a minor.

39. Irrespective of the form in which it was held, Klara Szanto and Paul Szanto used a portion of the $250,000 belonging to debtor, Peter Szanto to purchase the real property at 105 Baywood Avenue, Hillsborough CA (the Baywood property cost approximately $100,000) and the remainder ($150,000) was used to finance business expansion and real estate investments as well as general living expenses.

40. With accretions from the original sum, it is now anticipated that the present value of the original $250,000 is in excess of $8 million.

41. All of which, as will be rightfully demonstrated is part of the Bankruptcy estate of the debtor herein.

42. A partial, but not exhaustive, schedule of investments and use of capital by Klara Szanto and Paul Szanto from the money belonging to debtor are stated here to explain and to emphasize the breadth of value which accrued from the initial $250,000.00.

43. These investments and use-of-capital for business derived from the ever-increasing value of the house at 105 Baywood Avenue. Such equity accretion allowed for many rounds of refinancing which provided capital for use, among other things, as:

44. Purchase of shares in a corporation engaged in jewelry sales.

45. In, or about, 1985, the purchase of real property at 525 Kentucky Ave., San Mateo CA for the temporary benefit of defendant Barbara Szanto Alexander.

46. In, or about, 1989 the purchase of all the assets of Rafael Jewelry Corp., for the temporary benefit of Anthony and Mariette Szanto.

47. In, or about, 1989, the purchase of all of the assets of a thriving medical practice for the temporary benefit of Evye Szanto and Victor Szanto located in Red Bluff CA.

48. In, or about, 1989 the purchase of real property at 51 Mc Near, San Rafael CA, for the temporary benefit of Anthony and Mariette Szanto.

49. In, or about, 1989, the purchase of 2 parcels of real property on Daha Dr. in Red Bluff CA for the temporary benefit of Evye Szanto and Victor Szanto.

50. The purchase of various condominiums in Burlingame CA

51. The purchase of several four-plex apartments on Poplar Dr., in San Mateo CA.

52. The purchase of two apartment buildings on Elm St., in San Carlos CA.

53. The purchase of extensive collections of works of art.

54. In, or about, 1992, the purchase of a Lasik Ophthalmologic laser machine for the temporary benefit of Evye Szanto and Victor Szanto.

55. All these items, along with various loans of money to all, or some, of the defendants were never intended as permanent gifts.

56. As matters of fact and law, all these items, money, property and realty, remained – and are still today – assets belong to Peter Szanto's Bankruptcy estate.

### c. Defendants' Despicably Bad Acts and Moral Depravity

57. On February 2, 2005, while on active duty as an officer in the Israeli Defense Force, Peter Szanto was gravely injured when a Palestinian missile hit the armored vehicle he was commanding (3 soldiers in Peter Szanto's vehicle were killed instantly).

58. During the time when plaintiff / debtor was in a coma, and on the verge of death – when normal human families unite in prayer so as to petition the all mighty for the recovery of their loved ones --- the defendants, or some of them, herein began a reprehensible campaign to subvert and over-power the free wills and independent thinking of Klara Szanto and Paul Szanto so as to make money and real and personal property belonging to Peter Szanto, their own.

59. The steps – *and this recitation is not exhaustive* - undertaken by the defendants – or some of them – to abscond with Peter Szanto's money and property were the fraudulent manipulation of one of the Szanto family trusts through **extortionate**[1] acts upon Klara Szanto and Paul Szanto (eg. but not exhaustive, elder abuse through use of mind altering medications, depravation of food, water and toilet and statements that Peter Szanto had died).

60. By 2005, the elderly Klara Szanto and Paul Szanto had declined in mentality acuity, rational understanding of reality and the essential ability to comprehend or be cognizant of the nature and extent of their assets and the nature and extent of the assets of Peter Szanto over which they exercised controlled.

---

*1. Defendants' multitude of acts of extortion is the initial 18 USC 1961 RICO predicate identified against the defendants herein: extortion being the infliction of fear and threat of injury (food or medical depravation, etc.) upon Klara Szanto and Paul Szanto should they not sign documents foisted upon them by these defendants. Defendant's extortionate continued until Paul's death in 2009.*

61. Defendants, or some of them, succeeded in forcing by threat of bodily injury (ie, extortion) Klara Szanto and Paul Szanto to make multiple iterations of documents, including testamentary documents – which had absolutely no legal significance, because Klara Szanto and Paul Szanto could neither comprehend the nature, effect nor consequences of their actions.[3]

62. However, many of these fraudulently signed documents (eg, trust revisions and alienations of real property have been used by defendants to transfer money and real and personal property belonging to Peter Szanto.

63. Likewise, defendants, or some of them, falsely represented to various counsel that they were acting in conformance with the desires of Klara Szanto and Paul Szanto. When in fact Klara Szanto and Paul Szanto were no longer capable of articulating or undertaking rational contractual intent of any type.

64. And thus Klara Szanto and Paul Szanto were not able to contract in any manner whatsoever.

65. Thereafter, among other events, testamentary documents have been improperly foisted upon various courts, **without success**, as having testamentary moment, when, in fact, **they are merely, void documents secured through extortionate means.**

---

*[2]. Defendants also destroyed many documents, thinking all copies had been destroyed.*

66. The defendants' extortionate acquisition, manipulation and use of money and real and personal property belonging to Peter Szanto which began in 2005 continues today.

67. Also beginning in 2005, so as to bolster their unimpeded access to Peter Szanto's money and real and personal property, the defendants developed a strategy for stealing and using the identity of Peter Szanto as their own.

68. All of the exact methodologies whereby defendants Evye Szanto, Victor Szanto, Nicole Szanto, Kimberly Szanto, Mariette Szanto, Anthony Szanto, and Barbara Szanto Alexander conducted their improper use of Peter Szanto's likeness and identity will be shown, in exact detail, by proof at the trial of this matter.

69. Much more certainly, **HOWEVER**, the circumstantial proof of the defendants' identity theft actions is demonstrated by the fact that defendants had unfettered and unlimited access to, among other things Peter Szanto's office at the Baywood Avenue property.

70. Defendants were thereby able to secure for their identity-theft actions, Peter Szanto's official government documents (debtor's original U.S. naturalization certificate, debtor's original U.S. social security card, various expired driver's licenses, photo-id's from various courthouses where Peter Szanto had worked) as well as financial books, legal and bank papers belonging to Peter Szanto which he  retained in his office at the 105 Baywood Avenue property described *supra*.

71.  Plaintiff contends defendants secured one (or more) driver's license **with their image** by using plaintiff's 1960 naturalization certificate (containing a photo of plaintiff) or plaintiff's expired driver's license: by fooling Dept. of Motor Vehicles clerks that said naturalization photo or expired license  was the actually present-day (and present-in-person adult Victor or Anthony Szanto who was presenting those identifying documents in furtherance of a new driver's license.

73.  The newly secured driver's license, along with the original of Peter Szanto's official original social security card -- plus the presence of a spouse – possessing a valid driver's license, also with the surname Szanto  -- were utilized  – to facilitate defendants' theft-of-Peter Szanto's identity through opening bank accounts in a stolen name!!

74.  Alternately, photos on Peter Szanto's expired driver's licenses facilitated the acquisition of a new valid driver's license in Peter Szanto's name to be used by these defendants .

75.  Thereafter, provisioned with a valid driver's license in Peter Szanto's name along with Peter Szanto's original social security card, defendants were able to undertake the opening of bank accounts in the name of Peter Szanto with impunity.[4]

---

[4]. Defendants' multitude of acts "relating to fraud and related activity in connection with identification documents" is the second 18 USC 1961 RICO predicate identified against the defendants herein: the use of Peter Szanto's name, likeness and identity by these defendants' being proved circumstantially be all of the actions described herein –and other similar actions to be demonstrated at trial occurred between 2005 -9.

76. Peter Szanto's exceptionally diversified and **perfect** credit history, allowed the defendants to "plug into" banking solicitations and credit opportunities which provided defendants with access to credit cards, lines of credit and business credit facilities -- all in the name of Peter Szanto.

77. These credit facilities opened in Peter Szanto's name were in addition to over-drawing various bank accounts and "bouncing" checks which caused bad debts at a multitude of fraudulently opened checking accounts, all in the name of Peter Szanto.

78. Defendants' primary goal by these actions was to ruin and "trash" Peter Szanto's financial life – so as to "cover defendants tracks" during the manipulation and expropriation of assets belonging to Peter Szanto which were under control of the, now deceased, Klara Szanto and the now mentally and Parkinson's impaired Paul Szanto.

79. Defendants planned that if Peter Szanto ever managed to recover from his battlefield injuries, he would have plenty to keep his busy attempting to resuscitate his destroyed identity and financial profile.

80. Likewise, defendants anticipated that bedraggling Peter Szanto's business life, debts and fiancés would preoccupy Peter Szanto from interfering with defendants' festival of expropriation.

---

*3. Defendants' multitude of acts "relating to financial institution fraud" is the third 18 USC 1961 RICO predicate identified against the defendants herein: the use of Peter Szanto's name, likeness and identity by these defendants' being proved circumstantially be all of the actions described herein –and other similar actions to be demonstrated at trial. These acts occurred between 2005 and 2009.*

81. Here, the possibility and plausibility of these facts derives from the clear comprehension that the business sense and moral compass of these defendants (as will be shown by proof at the trial) was woefully inadequate to maintain the decadent lifestyles to which they aspired, but which they were living beyond their means.

82. Defendants were compelled and motivated to undertake the most despicable of actions: theft from their own brother through the suppression of the free will and mental acuity of their parents!!

83. Rather than pursue careers based on personal work, effort or achievement, these defendants found it expeditious (and lucrative) to pursue – and live out -- a depraved parasitic lifestyle based on conversion of **money** and **real property** and **personal property** and **identity** of their older brother, Peter Szanto.

84. Defendants motive and focus to convert and steal Peter Szanto's property was not merely derived from the opportunity that Peter Szanto's near fatal battlefield injury provided to defendants'.

85. Defendant's were also envious of the fact that it was Peter Szanto's $250,000 litigation recovery which had been able to propel Klara Szanto and Paul Szanto from the depths of poverty to an elegant and well-provided for lifestyle in a very posh San Francisco suburb.

86. In addition, it was not merely money-lust which motivated these defendants, but also their abject desire to degrade, belittle and humiliate Peter Szanto for perceived – but non-existent – childhood teasing and their own indolence and sloth.

87. That is, defendants were motivated not merely by desire for money and property, but also by the desire to avenge ordinary childhood joshing that was 40 years in the distant past.

### d. Defendants Attempt an End Run Around Truth, Law and Justice

88. In defendants' "bizzaro" world, no matter of decency, no aspect of morality nor any part of personal integrity is safe from desecration!!

89. To that end, defendants deprived Klara Szanto of food and water on her deathbed, demanding that she sign further testamentary codicils, the portent of which she had no comprehension.

90. Within a week after Klara Szanto died (or perhaps killed through food depravation or toxic injections) in 2005, defendants immediately established sham Nevada corporations for the sole purpose of looting – and making their own – Peter Szanto's money and real and personal property.

91. Paul Szanto, bereft at the loss of his wife of 60 years, was further malleable to defendants efforts to expropriate Peter Szanto's money and real and personal property.

92. To that end, defendants, and their counsel, barratriciously, undertook a sham probate proceeding in 2006 which sought, falsely, to re-characterize Peter Szanto's money and real property as though they were assets of a trust established by Klara Szanto and Paul Szanto.

93. Since 2006, defendants have been unable, irrespective of having hired dozens to attorneys to convince courts to ratify their fraudulent claims to any of Peter Szanto's money and real and personal property.

94. However, and this only became known to Peter Szanto in November 2016 – defendants impermissibly alienated the Baywood Avenue property during the pendency of the litigation which they initiated.

95. That is, defendants began an improper probate proceeding seeking title to real property owned by Peter Szanto.

96. Without any judicial order – and without and culmination of that probate action, defendants unilaterally alienated the Baywood property and expropriated the proceeds therefrom.

97. Only in December 2014, did plaintiff become aware that security of his identity and personal, private identifying information had been compromised.

98. The information regarding said stolen identity came *via* a demand from the Internal Revenue Service (henceforth IRS) [EXHIBIT A] for additional taxes based on cancellation of debt income.

99. Plaintiff's investigation, research and analysis – along with information obtained from the IRS and the Department of Justice demonstrated use of plaintiff's name and identity by the defendants to obtain credit and open bank accounts in plaintiff's name, but with neither plaintiff's knowledge nor permission.

100. Thereafter, said improperly opened accounts went unpaid and defendants expropriated the money from those improperly opened bank accounts.

101. The lending institutions thereafter declared said debts worthless -- and applied for tax credits based on cancellation of debt --- and the cancelled debt became imputed taxable income to plaintiff.

102. It is upon these facts that plaintiff contends the following causes of action.

## First Cause of Action Conversion of Debtor's Physical Assets (Including Money, Property and Realty) by the Defendants

103. The pleading elements necessary to sustain recovery upon a cause of action based on conversion are these:

104. First, plaintiff avers his right to ownership of that real property commonly known as 105 Baywood Av., Hillsborough CA and the structure thereupon and all appurtenances thereto.

105. The value of the property will be demonstrated by proof, but is reasonably estimated to have a value in excess of $8 million.

106. The structure upon the property described above and not readily capable of duplication and an additional award for said uniqueness will be demonstrated.

107. Plaintiff will also demonstrate and seek recover of all money and property which can be traced as accretions from the use of capital generated from the increasing value of the 105 Baywood Av property.

108. Plaintiff maintained an apartment at the 105 Baywood Av. property which contained personal property, financial / personal records and other items estimated to be of a value of $200,000 at the time of their expropriation in 2005.

109. Defendants accomplished the conversion of plaintiff's property by the wrongful acts of:

110. **A.** absconding with and expropriating complainant's personal property while complainant was away from the 105 Baywood Ave property

111. **B.** depriving plaintiff of access to the 105 Baywood Ave property so as that he could retrieve complainant's personal property.

112. The dispossession of complainant's property rights was furthered by defendants artifice of pretending that they knew nothing about the converted property.

113. These acts of conversion commenced in 2005 and continue today while defendants continue the use and enjoyment of plaintiff's purloined money and property.

114. Plaintiff suffered damage thereby, because he has lost the converted property in its entirety in an amount to be shown by proof to be in excess of $8 million.

## Second Cause of Action: Conversion of Debtor's Personality, Image, Likeness, Unique Identifying Factors and Other Similar Individual Identifying and Recognition Features by the Defendants (Generally Encompassed by the Terms Intentional and Malicious Use of Another's Identity for Improper Personal Gain)

115.  The tort of identity theft is merely a permutation of the civil tort of conversion.

116.  Here, defendants were able to secure and convert official legal documents, photographs and the name of plaintiff to their own use of plaintiff's name, image and likeness.

117.  The fundamental concept of conversion is that the converter treats another's property as his own.

118.  Here, defendants expropriated and subsumed all of plaintiff's personal characteristics, banking history and credit profile and used it as their own.

119.  As demonstrated on [EXHIBIT A] defendants were able to generate profit for themselves by the creation of debt which they failed to repay.

120.  Additional examples of debt created in the name of plaintiff by defendants' conversion of plaintiff's identity will be demonstrated at trial.

121. Plaintiff asks damages in an amount to be shown by proof.

122. Plaintiff asks a further injunction to bar defendants use of his name or likeness in the future.

### Third Cause of Action: Civil Claim for Relief Based on Statutory Remedies for Defendants' Improper Racketeer Influenced and Corrupt Organizations Act Actions Which Have Harmed, Injured and Damaged Plaintiff

123. Plaintiff has outlined *supra* the RICO predicates which make defendants' actions heinously reprehensible **racketeering**.

124. 18 USC § 1964 provides civil remedies under the Racketeer Influenced and Corrupt Organizations Act (RICO).

125. The RICO violations already enumerated will be supplemented by defendants' further improper RICO violations which will be proven at trial.

126. 18 USC 1964(a) provides that Federal Courts shall have jurisdiction to prevent and restrain violations of 18 USC 1962 by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future

activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

127. Here, plaintiff asks the Court to restore to him those monies and property which were improperly taken from him by the defendants.

128. Moreover, 18 USC § 1964(c) provides that plaintiff's injuries, based on RICO violations **shall** recover <u>threefold</u> the damages sustained.

129. Here, plaintiff has been injured by defendants' actions relating to RICO conversions of his money, real property and personal property.

130. Plaintiff estimates the present value of money and property converted by defendants to be in excess of $8 million (prior to the threefold award).

131. Plaintiff asks an award of treble the $8 million damages which will be shown by proof.

## Fourth Cause of Action: Breach of Fiduciary Duty

132. Plaintiff concedes that there are various financial vehicles in existence which relate to money and property of the Szanto family.

133. Plaintiff contends that defendants, in their capacities as fiduciaries of Szanto trusts had a fiduciary duty to keep and make safe and secure plaintiff's portions of property held in those trusts.

134. Plaintiff contends that defendants breached their fiduciary duties by expropriation of plaintiff's trust property.

135. Plaintiff seeks recompense for these breaches in an amount to be shown by proof.


## Fifth Cause of Action: Fraud

136. Plaintiff contends that the defendants made false and fraudulent statements concerning material facts.

137. To wit, defendants made many statements regarding plaintiff's identity which they knew to be untrue (particularly that they had right (or implication of the right) to use plaintiff's identity).

138. The most significant of defendants' improper fraudulent acts was the use of plaintiff's identity without plaintiff's permission.

139. Defendants knew at the time of making various false and fraudulent statements regarding plaintiff that they were actually making false and intentionally misleading representations regarding plaintiff's identity and identifying information.

140. Defendants' intent, by the making of false statements was that their representations would induce others (ie- banks and other lenders) to act upon their false representations -- **ALL TO THE INHERENTLY INTENTIONAL DETRIMENT OF PLAINTIFF.**

141. Here, all of the banks which loaned and advanced monies to the defendants relied upon defendants' fraudulent statements regarding plaintiff's identity.

142. The reliance of various financial entities on defendant's actions harmed plaintiff, **because money loaned using plaintiff's name was never repaid. Said money thus became a permanent credit defect and impediment to plaintiff's own use of his own name in the opening of financial instruments.** (as well as dealing with collection agents, who even today are demanding return of money borrowed by defendants in plaintiff's name!!).

143. The consequence thereof being that money loaned in plaintiff's name, but without plaintiff's permission was ascribed as a bad-debt and misuse of credit against plaintiff.

144. The elements of a cause of action for fraud are as follows:

   (1) false and fraudulent statements concerning material facts. Here, defendants made many statements regarding their phony use of plaintiff's identity.

   (2) knowledge by the person making the false and fraudulent statements that they are making actually false representations.

Here, at all times defendants knew that their true intent was borrowing money **without** any intent of repayment – using the name and identity of another person.

(3) intent by the person(s) making false representations that the representation will induce another to act upon their false representations. Here, defendants knew to an ABSOLUTE certainty based on plaintiff's exceptional credit standing, that lenders would be induced to rely on defendants' representations and would loan money in the name of plaintiff.

(4) reliance on the representations to the injury of the other party. Here, lenders relied on defendants' representations all to plaintiff's injury (because now plaintiff is on-the-hook for money borrowed AND plaintiff's credit standing has not merely been tarnished, but has been decimated and destroyed.

145. Plaintiff seeks recompense for these actions in an amount to be shown by proof,

## Sixth Cause of Action: Conspiracy

146.    In *Pitts v. King*, (1932) 141 Or 23, 28, 15 P.2nd 379, Oregon
adopted the following as a definition for a conspiracy in a civil action:

> "A conspiracy is a combination of two or more
> persons by some concerted action to accomplish
> some criminal or unlawful purpose or to accomplish
> some purpose not in itself criminal by unlawful
> means."

147.    Plaintiff alleges that all of the defendants, through their joint and
concerted actions -- sought to accomplish the common unlawful
purpose of use of plaintiff's identity without plaintiff's permission.

148.    Plaintiff seeks further restitution for that abuse of his identity in an
amount to be shown by proof.

## Seventh Cause of Action: Improper Creation of
## Income Tax Liability Against Debtor by Defendants

149.    28 USC § 1340 makes jurisdiction over internal revenue matters
exclusive to Federal courts.

150. Upon that basis, plaintiff asks this Court to reassign the tax liability represented in [EXHIBIT A] to the defendants, based on the fact that defendants created the debt upon which charge-off / cancellation of debt income was imputed.

## Eighth Cause of Action: Intentional / Negligent Infliction of Emotional Distress

151. Oregon law has settled that recovery is permitted for emotional distress and psychic injuries which are not the results of any physical injuries.

152. Here, the wanton, callous and improper machinations of defendants have created the instant conversions and expropriations of plaintiff's money, real property, personal property and identity.

153. Plaintiff seeks recompense for the emotional harm and emotional injury he  has suffered thereby, in an amount to be shown by proof.

154. Examples of Oregon cases holding emotional injury / psychic distress compensible -- **without physical injury** -- are (but not limited to) *Mooney v. Johnson Cattle*, (1981) 291 Or 709, 634 P.2nd 1333 (intentional interference with a contractual relationship); *Turman v. Central Billing Bureau*, (1977) 279 Or 443, 568 P.2nd 1382 (intentional infliction of emotional distress); *McEvoy v. Helikson*, (1977) 277 Or 781, 562 P.2nd 540 (negligence in returning passports); *Fredeen v. Stride*, (1974) 269 Or 369, 525 P.2nd 166 (conversion of a dog); *Macca v. Gen. Telephone Co. of N.W.*, (1972) 262 Or 414, 495 P.2nd 1193 (negligent listing in telephone directory, considered to be a nuisance); *Douglas v. Humble Oil*, (1968) 251 Or 310, 445 P.2nd 590 (trespass); *Hovis v. City of Burns*, (1966) 243 Or 607, 415 P.2nd 29 (unauthorized disinterment of spouse); *Hinish v. Meier & Frank Co.*, (1941) 166 Or 482, 113 P.2nd 438 (invasion of privacy).

155. In each of the cases *supra*, <u>as in the instant case</u>, the plaintiff was the *direct* victim of tortious conduct, although no *physical* injury was involved.

156. In *Norwest v. Presbyterian Intercommunity Hosp.*, (1982) 293 Or 543, 652 P.2nd 318, the court specifically stated that the fact that an injury is solely emotional or psychic is no reason to deny damages.

157. Here, plaintiff pleads emotional distress as arising from defendants' acts of conversion.

158. Evidence and extent of plaintiff's emotional distress will be shown by proof.

## **PRAYER for RELIEF**

159.  Plaintiff seeks an award, to be demonstrated by proof, as recompense for the conversion of his identity and property.

160.  Plaintiff seeks an additional award of $200,000 as the amount he reasonably anticipates expending in the rehabilitation of his credit reputation and standing.

161. Plaintiff asks that this Court reassign Federal tax liability according to proof -- from plaintiff to the defendants.

162. Plaintiff asks such further relief as this Court may deem to be just and proper.

DATED 6 December 2016 _____ Peter Szanto

## Proof of Service

My name is Susan Bier, I am over 21 years of age and not a party to the with action. My business address is PO Box 4614, Portland OR 97208. On the date indicated below, I personally served the within:

## First Amended Complaint

on:  1. David Olsen, 3013 Wolsey Pl., Fremont CA 94555

2. Christopher N. Coyle,
   319 SW Washington, #520
   Portland, OR  97204

by mailing copies of said document to the above parties' counsels *via* 1st class mail, postage prepaid.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Signed at Portland OR.

Dated 12-6 -16 _____

Form **4549-A**
(Rev. March 2013)

Department of the Treasury-Internal Revenue Service
## Income Tax Examination Changes
**(Unagreed and Excepted Agreed)**

| Name and Address of Taxpayer | Taxpayer Identification Number | Return Form No.: |
|---|---|---|
| PETER & SUSAN SZANTO<br>11 SHORE PINE DR<br>NEWPORT COAST  CA  92657-1544 | | 1040 |
| | Person with whom examination changes were discussed. | Name and Title: |

| 1. Adjustments to Income | Period End 12/31/2010 | Period End | Period End |
|---|---|---|---|
| a. Cancellation of Debt Income | 292,868.00 | | |
| b. Subsitite Payments Income | 1,093.00 | | |
| c. Itemized Deductions | 1,588.00 | | |
| d. Exemptions | 7,300.00 | | |
| e. | | | |
| f. | | | |
| g. | | | |
| h. | | | |
| i. | | | |
| j. | | | |
| k. | | | **EXHIBIT A** |
| l. | | | |
| m. | | | |
| n. | | | |
| o. | | | |
| p. | | | |
| 2. **Total Adjustments** | 302,849.00 | | |
| 3. Taxable Income Per Return or as Previously Adjusted | (17,111.00) | | |
| 4. **Corrected Taxable Income** | 285,738.00 | | |
|     Tax Method | SCHEDULE D | | |
|     Filing Status | Joint | | |
| 5. **Tax** | 65,811.00 | | |
| 6. **Additional Taxes / Alternative Minimum** | 5,905.00 | | |
| 7. Corrected Tax Liability | 71,716.00 | | |
| 8. **Less** a. | | | |
|    **Credits** b. | | | |
|    c. | | | |
|    d. | | | |
| 9. **Balance** *(Line 7 less total of Lines 8a thru 8d)* | 71,716.00 | | |
| 10. Plus a. | | | |
|   Other b. | | | |
|   Taxes c. | | | |
|   d. | | | |
| 11. Total Corrected Tax Liability *(Line 9 plus Lines 10a thru 10d)* | 71,716.00 | | |
| 12. Total Tax Shown on Return or as Previously Adjusted | 0.00 | | |
| 13. Adjustments to: a. See Attached | (800.00) | | |
|    b. | | | |
|    c. | | | |
| 14. Deficiency-Increase in Tax or *(Overassessment - Decrease in Tax)* *(Line 11 less Line 12 adjusted by Lines 13a through 13c)* | 72,516.00 | | |
| 15. Adjustments to Prepayment Credits-Increase *(Decrease)* | | | |
| 16. **Balance Due or** *(Overpayment)* - *(Line 14 adjusted by Line 15)* *(Excluding interest and penalties)* | 72,516.00 | | |

Catalog Number 23110T        www.irs.gov        Form **4549-A** (Rev. 3-2

Case 16-03114-pcm    Doc 34    Filed 12/06/16

Form **4549-A**
(Rev. March 2013)

Department of the Treasury-Internal Revenue Service
## Income Tax Examination Changes
### (Unagreed and Excepted Agreed)

Page ___2___ of ___2___

Name of Taxpayer
PETER & SUSAN SZANTO

Taxpayer Identification Number

Return Form No.:
1040

| 17. Penalties/ Code Sections | Period End 12/31/2010 | Period End | Period End |
|---|---|---|---|
| a. Delq-IRC 6651(a)(1) | 17,502.76 | | |
| b. Accuracy-IRC 6662 | 14,503.20 | | |
| c. | | | |
| d. | | | |
| e. | | | |
| f. | | | |
| g. | | | |
| h. | | | |
| i. | | | |
| j. | | | |
| k. | | | |
| l. | | | |
| m. | | | |
| n. | | | |
| **18. Total Penalties** | 32,005.96 | | |
| Underpayment attributable to negligence: *(1981-1987)* *A tax addition of 50 percent of the interest due on the underpayment will accrue until it is paid or assessed.* | | | |
| Underpayment attributable to fraud: *(1981-1987)* *A tax addition of 50 percent of the interest due on the underpayment will accrue until it is paid or assessed.* | | | |
| Underpayment attributable to Tax Motivated Transactions *(TMT)*. Interest will accrue and be assessed at 120% of underpayment rate in accordance with IRC 6621(c). | 0.00 | | |
| **19. Summary of Taxes, Penalties and Interest:** | | | |
| a. Balance due or *(Overpayment)* Taxes - *(Line 16, Page 1)* | 72,516.00 | | |
| b. Penalties *(Line 18)* - computed to 12/09/2014 | 32,005.96 | | |
| c. Interest *(IRC § 6601)* - computed to 01/08/2015 | 12,229.61 | | |
| d. TMT Interest - computed to 01/08/2015 *(on TMT underpayment)* | 0.00 | | |
| e. Amount due or refund - *(sum of Lines a, b, c and d)* | 116,751.57 | | |

**Other Information:**

IRC 6404(g) does not apply.

## EXHIBIT A

| Examiner's Signature: Name | Employee ID: | Office: | Date: |
|---|---|---|---|
| John Reed | 0246270 | | 12/09/2014 |

The Internal Revenue Service has agreements with state tax agencies under which information about federal tax, including increases or decreases, is exchanged with the states. If this change affects the amount of your state income tax, you should amend your state return by filing the necessary forms.

You may be subject to backup withholding if you underreport your interest, dividend, or patronage dividend income you earned and do not pay the required tax. The IRS may order backup withholding *(withholding of a percentage of your dividend and/or interest payments)* if the tax remains unpaid after it has been assessed and four notices have been issued to you over a 120-day period.

Case 16-03114-pcm    Doc 34    Filed 12/06/16